# Illinois Official Reports

## Appellate Court

---

### *People v. Evans*, 2016 IL App (1st) 142190

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRYL EVANS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-2190 |
| Filed | December 13, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-16639; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Elena B. Penick, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1        In 2014, a jury convicted Darryl Evans of murder. Before *voir dire*, the trial court refused to allow Evans's step-grandmother to remain in the courtroom due to worries about possible juror contamination and the courtroom's small gallery, which could barely accommodate the 45 prospective jurors that the court had already summoned. In so doing, the trial court violated the right to a public trial, and as it was structural error, we must reverse Evans's conviction on that ground. Because of our disposition, we need not reach the other contentions of error.

¶ 2                                                BACKGROUND

¶ 3        As the trial court was about to begin *voir dire*, it asked why someone was sitting in the gallery. Evans's attorney explained that Evans's step-grandmother, Ms. Peterson, was there. The trial court immediately responded, "I'm going to ask you to leave and come back on Monday." Evans's attorney told the trial court that she had explained to Ms. Peterson "the rules of decorum," and that "she is not to speak to any venire person." The trial court said, "she's been fine," but then stated that it would ask Ms. Peterson to leave during jury selection anyway because "we won't have enough room." Evans's attorney asked if Ms. Peterson could be "segregated" from the venire, because "it is a public trial." The trial court said that there was no "contamination" but would ask Ms. Peterson to leave anyway. Evans's attorney objected. *Voir dire* included a number of peremptory challenges and a challenge for cause before a jury was selected.

¶ 4        After testimony began, the trial court made another statement for the record regarding the *voir dire*. The court stated that it was not prohibiting anyone from attending but asked Ms. Peterson to leave, because the courtroom had only three rows of seats and 45 potential jurors, and it would be impossible to separate Ms. Peterson from the venire to avoid contamination.

¶ 5        The jury convicted Evans of first degree murder. In arguing Evans's motion for a new trial, his attorney raised the issue of Ms. Peterson being barred from *voir dire* and stated that there would have been enough room to accommodate her and that she was not a risk to contaminate the jury pool. The trial court stated that the courtroom only contained three rows of benches, and it barred Ms. Peterson from *voir dire* due to the small size of the courtroom and the need to prevent her from contaminating the jury. The trial court denied the motion for a new trial and sentenced Evans to 100 years of imprisonment.

¶ 6                                                  ANALYSIS

¶ 7        Evans argues that his right to a public trial was denied when the trial court barred Evans's step-grandmother, Ms. Peterson, from viewing the *voir dire*. We hold that this denial was structural error, and we must reverse.

¶ 8        The sixth amendment of the United States Constitution (U.S. Const., amend. VI) guarantees the accused the right to a public trial, and this right extends to *voir dire* of prospective jurors. *Presley v. Georgia*, 558 U.S. 209, 212-13 (2010). A violation of this right falls into the limited category of "structural errors," which require automatic reversal without the need to show prejudice. *People v. Thompson*, 238 Ill. 2d 598, 608-09 (2010) (structural error category includes complete denial of counsel, trial before biased judge, racial discrimination in grand jury selection, denial of self-representation, denial of public trial, and

defective reasonable doubt instruction). These errors are systemic, "erode the integrity of the judicial process," and "undermine the fairness of the defendant's trial." (Internal quotation marks omitted.) *Id.* at 608. An error will be designated structural only if it renders the trial fundamentally unfair or an unreliable means of determining guilt or innocence. *Id.* at 609.

¶ 9 This is a fact-specific inquiry and we review the totality of the circumstances. We observe that the trial court's rationale for excluding Ms. Peterson changed slightly; initially, the court was not concerned that Ms. Peterson would contaminate the potential jurors. But we will address both of the trial court's reasons for excluding her—the contamination of potential jurors and the small size of the courtroom.

¶ 10 To justify closing a trial proceeding, we examine: (i) whether there exists an " 'overriding interest that is likely to be prejudiced,' " (ii) whether the closure is no broader than necessary to protect that interest, (iii) whether the trial court considered " 'reasonable alternatives' " to closing the proceeding, and (iv) whether the trial court made adequate findings to support the closure. *People v. Willis*, 274 Ill. App. 3d 551, 553 (1995) (quoting *Waller v. Georgia*, 467 U.S. 39, 48 (1984)).

¶ 11 We will assume that preventing juror contamination is an "overriding interest." *Id.* at 554; *People v. Taylor*, 244 Ill. App. 3d 460, 467 (1993). But, we are not convinced that the interest in preventing contamination was "likely to be prejudiced" merely by Ms. Peterson's presence. No evidence suggested Ms. Peterson would have attempted to communicate with or intimidate potential jurors; in fact, Evans's counsel had already instructed her not to communicate with the jury pool. See *Taylor*, 244 Ill. App. 3d at 468 (first part of test not met where there was not "a scintilla of evidence" that defendant's siblings would attempt to influence jurors); *Gibbons v. Savage*, 555 F.3d 112, 117 (2d Cir. 2009) ("Absent some indication that the defendant's mother might communicate improperly with members of the venire, the mere fact that some might be in close proximity to her did not raise a meaningful risk to taint the entire jury pool, as the judge suggested." (Internal quotation marks omitted.)). There must be a specific threat of jury contamination to meet this standard. See, *e.g.*, *Willis*, 274 Ill. App. 3d at 554 (where defendant's brother had previously threatened state witness, this might justify exclusion of brother from *voir dire*, but not other family members). As the United States Supreme Court has pointed out, "[t]he generic risk of jurors overhearing prejudicial remarks, unsubstantiated by any specific threat or incident, is inherent whenever members of the public are present during the selection of jurors. If broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course." *Presley*, 558 U.S. at 215.

¶ 12 The trial court's second reason for barring Ms. Peterson was the limited number of seats available in the courtroom. This has even less weight than the worry about jury contamination. *Gibbons*, 555 F.3d at 117. Whether 45 potential jurors can sit in the courtroom at one time is solely a matter of logistics and convenience for courtroom personnel—it has no positive effect on the fairness of the trial. Many courtrooms are undersized for their needs. *Presley*, 558 U.S. at 210 (trial court noted for record that venire consisted of 42 potential jurors and all rows of seats would be filled). But even in a cramped physical space, trial courts can deal with this limitation in ways that do not burden a defendant's constitutional rights. The size of a courtroom, or the number of potential jurors who are summoned to a courtroom, do not constitute an "overriding interest."

¶ 13     We also examine whether the trial court's removal of Ms. Peterson was broader than necessary to protect the "overriding interest." Though Ms. Peterson was barred from the courtroom for only one day, the trial court did not need to bar her to prevent juror contamination or deal with a large venire in a small space. As we will discuss, a number of alternatives exist that the trial court could have considered.

¶ 14     Next, as to weighing "reasonable alternatives" to removal, the trial court fell short. Evans's attorney suggested "segregating" Ms. Peterson from the venire, but the trial court rejected this out of hand due to the 45-person venire filling all available seats. *Gibbons*, 555 F.3d at 118 (obligation to consider reasonable alternatives implies obligation to accept reasonable alternative). Contrary to the State's suggestion at oral argument, Evans's attorney did not even need to suggest reasonable alternatives. See *Presley*, 558 U.S. at 214 (trial court must consider alternatives to closure even when not offered by parties). Given the seriousness of the potential harm, each trial judge must be alert and proactive in managing his or her courtroom to prevent violations of this core constitutional right, regardless of whether the attorneys assist in the process.

¶ 15     As a reviewing court, we can conceive reasonable alternatives—many of which are based in common sense. Even in a small courtroom, the trial court could have allowed Ms. Peterson to stay by simply calling the potential jurors into the room in smaller groups; asking Ms. Peterson or a potential juror to stand until a seat became available; or instructing the potential jurors and Ms. Peterson not to interact. *Presley*, 558 U.S. at 215 (reasonable alternatives include reserving space for public, dividing venire into smaller groups, or instructing potential jurors not to communicate with audience members); *Gibbons*, 555 F.3d at 117 (trial court could have called fewer potential jurors into room, allowed sole spectator to stand until seats became vacant, or temporarily placed spectator in another part of courtroom); *Willis*, 274 Ill. App. 3d at 554 (trial court could have admonished prospective jurors and spectators to refrain from contact or stationed bailiff next to venire to deter contact).

¶ 16     Finally, we assess whether the trial court made adequate findings to support the closure. The trial court did make a record as to the small size of the courtroom (though we do not find this to be an overriding interest) but failed to make any finding that Ms. Peterson was likely to contaminate the venire. *Presley*, 558 U.S. at 215 (where threats of juror contamination or safety concerns are enough to warrant closing *voir dire*, trial court must still articulate findings specific enough for appellate review).

¶ 17     Though neither party has addressed it, a temporary closure may not violate the sixth amendment if it is "trivial." *People v. Jones*, 2014 IL App (1st) 120927, ¶ 45 (trial court's brief *in camera* questioning of two potential jurors had no meaningful detriment to trial's fairness); see also *People v. Webb*, 267 Ill. App. 3d 954, 959 (1994) (spectator missed "*de minimis* portion" of trial consisting of "a few minutes of discussion"). What occurred here is in no way a "trivial" closure. Ms. Peterson missed the entirety of jury selection, including questioning of potential jurors and a number of peremptory challenges. *Cf. Gibbons*, 555 F.3d at 121 (exclusion of defendant's mother from one session of *voir dire* was trivial where there were no objections and she was able to watch next session). If, as the Supreme Court has instructed, the right to a public trial extends to *voir dire*, then Ms. Peterson's exclusion was a complete denial of that right.

¶ 18     We cannot help but note that the trial court's concern about space—that this particular courtroom did not have enough seating for even one member of the public—will be true of

every criminal case held therein which the trial court summons a large number of potential jurors and true for other similarly sized courtrooms. We cannot hold that a defendant may be denied the right to a public trial in these circumstances. We would hope that no defendants, besides Evans, were affected in this way.

¶ 19 In the United States of America, the evidence's strength or the defendant's guilt have no bearing on our consideration of the historic and cherished right to a public trial. The law guards this right with utmost vigilance. As the United States Supreme Court recognized, "[t]he requirement of a public trial is for the benefit of the accused; that the public may see he [or she] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep [the] triers keenly alive to a sense of their responsibility and to the importance of their functions." (Internal quotation marks omitted.) *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979). See also *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571-72 (1980) ("To work effectively, it is important that society's criminal process 'satisfy the appearance of justice,' [citation] *** [which] can best be provided by allowing people to observe it.").

¶ 20 Reversed and remanded.