# Illinois Official Reports

## Appellate Court

---

### *People v. Radford*, 2018 IL App (3d) 140404

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TAVARIUS D. RADFORD, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-14-0404 |
| Filed<br>Rehearing denied | July 13, 2018<br>August 9, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 11-CF-662; the Hon. Clark Erickson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Steven P. Varel, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James R. Rowe II, State's Attorney, of Kankakee (Patrick Delfino and Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justice Wright concurred in the judgment and opinion.<br>Justice McDade dissented, with opinion. |

**OPINION**

¶ 1      A jury convicted defendant, Tavarius D. Radford, of felony child endangerment (720 ILCS 5/12-21.6(a) (West 2010)), for which the trial court sentenced him to 42 months in prison. Defendant now appeals his conviction. First, defendant argues that the State's evidence failed to prove his guilt beyond a reasonable doubt. Second, he contends that the trial court plainly erred by issuing a child endangerment jury instruction that misstated the requisite *mens rea* or, in the alternative, counsel provided ineffective assistance by not objecting to the instruction. Finally, defendant claims the trial court violated his right to a public trial by partially closing the courtroom during *voir dire* and, later in the trial, asking journalism students in the audience to find a seat or leave the courtroom. For the following reasons, we affirm defendant's conviction.

¶ 2                          BACKGROUND

¶ 3      The State charged defendant with murder and child endangerment after his 26-month-old daughter died from traumatic head injuries on October 26, 2011. Around 10 a.m. that morning, Kayleigh Reardanz found her daughter, M.R., unresponsive in their Bourbonnais apartment. By the time she reached the hospital, M.R. had fallen into cardiac arrest. After attempting to resuscitate her, the treating physician pronounced M.R. dead shortly after 11 a.m. The forensic pathologist who performed M.R.'s autopsy concluded that blunt head trauma from child abuse caused her death. M.R.'s death certificate described her manner of death as homicide due to child abuse. Defendant's jury trial began November 18, 2013.

¶ 4      Prior to *voir dire*, the trial court recognized that, although jury selection is a public proceeding, the courtroom could not accommodate over 90 potential jurors and spectators present for the proceedings. The record indicates that M.R.'s family members and other members of the public regularly attended pretrial hearings. Due to the nature of the case, the trial court also noted that the large congregation of spectators with "emotions running high" risked contaminating the jury pool.

¶ 5      The court observed that the spectators appeared equally divided between those who supported defendant and those who did not. In an effort to preserve defendant's public trial right and proceed with jury selection, the court asked all spectators, except two who supported defendant and two who did not, to leave the courtroom. The court let the spectators decide who would remain in the courtroom. Neither defendant nor his counsel objected to this partial closure.

¶ 6      Kayleigh testified that she, defendant, and M.R. lived in the Bourbonnais apartment for approximately one month before M.R.'s death. They lived in the apartment with Kayleigh's grandparents, Cheryl and David Heather, and close friends, Kimberly and Echo Brewington. On October 26, 2011, Kayleigh found M.R. unresponsive around 10 a.m. Her skin was blue in color and very cold. Kayleigh became upset and yelled for help. She called 911 and handed the phone to Kimberly. Before the ambulance arrived, David attempted to resuscitate M.R. by performing CPR. Doctors pronounced M.R. dead just after 11 a.m.

¶ 7      Kayleigh spoke with police at the hospital and again days after M.R.'s death. During these conversations, Kayleigh did not disclose M.R.'s prior falls or medical history. She testified that she believed M.R. died from sudden infant death syndrome (SIDS), so she did

not think to disclose M.R.'s prior falls to police. After M.R.'s autopsy revealed that she died from head trauma caused by child abuse, police interviewed Kayleigh a third time. This time, she informed police of M.R.'s prior falls and medical history.

¶ 8　　　Kayleigh testified that M.R. was born in August 2009. Soon after, M.R. developed a blue sclera and grew to be unusually large for her age. Her pediatrician believed these symptoms were consistent with osteogenesis imperfecta (brittle bone disease) and recommended a blood test and appointment with a geneticist. When Kayleigh and defendant received M.R.'s blood test results, they decided not to consult the geneticist.

¶ 9　　　In January or February 2011, M.R. fell down and hit her head while defendant babysat her. Defendant took M.R. to the emergency room; Kayleigh met him there. M.R.'s computed tomography (CT) scans were negative, and the treating physician discharged her. Kayleigh noticed a "knot" on M.R.'s forehead at the hospital.

¶ 10　　　Kayleigh also testified that M.R. "split her eyebrow open" later in 2011 while Kayleigh's friend babysat. Then, on Easter in 2011, M.R. slipped in Kayleigh's mother's bathtub and "busted her chin." M.R. went to the emergency room after both falls.

¶ 11　　　In September 2011, M.R.'s pediatrician diagnosed her with mild anemia. On October 13, Kayleigh again took M.R. to her pediatrician due to a large rash on her chest. Kayleigh pointed out bite marks on M.R.'s arm where she bit herself. The pediatrician believed that capillary hemangiomas caused M.R.'s rash. M.R.'s self-harm stemmed from a behavioral issue unrelated to the rash. The rash subsided the next day, so defendant and Kayleigh never took M.R. to undergo bleeding and bruising panels that her pediatrician ordered.

¶ 12　　　On October 22, M.R. fell and hit her head on the pavement while playing outside with Kayleigh. Kayleigh examined M.R.'s head but saw no injury; she did not take M.R. to the hospital. However, she kept M.R. awake for at least one hour after the fall in case she sustained a concussion.

¶ 13　　　Kayleigh also testified that M.R. fell the day before her death. She threw herself backwards during a tantrum and hit her head on the pavement. After the incident, M.R. complained of head pain. While Kimberly and Kayleigh were styling M.R.'s hair later that night, M.R. complained of pain when they touched the back of her head. Cheryl, Kimberly, and Kayleigh examined M.R.'s head but did not see any indication of injury. Although Kayleigh stated these events occurred the day before M.R.'s death, Echo testified that it occurred on October 23, three days before M.R.'s death.

¶ 14　　　Kayleigh stated that she worked from 3 p.m. until 11 p.m. on October 25. When she returned to the apartment after work, she noticed M.R. whimpering and shaking. Kayleigh asked M.R. if she was in pain; she indicated that she was not. M.R. commonly shook when she became impatient, so Kayleigh was not alarmed by M.R.'s behavior. Kayleigh discovered M.R. unresponsive the next morning.

¶ 15　　　Cheryl testified that Kayleigh took her to the grocery store in the early afternoon on October 25. M.R. was asleep when Cheryl and Kayleigh returned to the apartment before 3 p.m. After quickly getting ready, Kayleigh left for work around 3 p.m. At around 5 p.m., Cheryl agreed to watch M.R., who was still asleep, while defendant and Echo biked to Kankakee.

¶ 16    Echo testified that she and defendant were gone for at least two hours—they biked to a friend's house, purchased marijuana, and smoked it in a nearby park. M.R. was still asleep when defendant and Echo returned to the apartment around 7 p.m.

¶ 17    Although defendant did not testify on his own behalf, the jury viewed his videotaped police interview. Before the jury viewed the interview, journalism students from a local university entered the courtroom to observe the proceedings, specifically the interview. The trial court asked the students to "find a place to sit" or they would have to leave the courtroom. The record does not indicate whether any of the students left the courtroom.

¶ 18    During the interview, defendant told police that he tucked M.R. in for a nap before 3 p.m. on October 25. A few minutes later, defendant returned to check on M.R. She was playing with a wooden unicorn plaque instead of sleeping. Defendant grew angry at M.R.'s insubordination and tucked her in "kind of roughly." He immediately apologized to M.R. and told her that he loved her.

¶ 19    Defendant told police that he did not believe M.R. could have been injured when he tucked her in. He speculated that she may have hit her head on the wooden plaque, but he was uncertain. However, when defendant demonstrated his action toward M.R. on a stuffed bear, he told police the demonstration was less aggressive than how he tucked M.R. in because he did not want to hurt the bear.

¶ 20    Defendant also told police that M.R.'s naps would typically last between 60 and 90 minutes; on October, 25, she slept for at least 4 hours. She seemed to have no appetite and ate very little at dinner after she awoke from her nap. Defendant also told police that M.R. may have vomited after dinner, but he could not remember for certain.

¶ 21    Two experts presented crucial testimony regarding M.R.'s manner of death. Dr. Valerie Arangelovich, the forensic pathologist who performed M.R.'s autopsy, opined that abuse caused M.R.'s fatal head trauma. Dr. Shaku Teas, an experienced forensic pathologist, disagreed with Arangelovich's conclusion and criticized her methods. Teas found no signs of child abuse in M.R.'s autopsy record.

¶ 22    Specifically, Teas disagreed with Arangelovich's conclusion that M.R.'s fatal injuries occurred within 24 hours of her death. Arangelovich found subgaleal and subdural injuries in M.R.'s brain—both experts agreed that the subdural injuries directly caused M.R.'s death. Both experts also agreed that the subgaleal injuries were likely old injuries. Arangelovich found iron when she sampled M.R.'s subgaleal injuries. Iron in adult injuries indicates the injury is at least three days old; there is no accepted iron-testing scale for children.

¶ 23    Arangelovich also observed "very rare" fibroblasts in M.R.'s subdural injuries. In adults, fibroblasts do not appear until at least three days after sustaining an injury. In children, fibroblasts can occur naturally or in response to an injury. Arangelovich could not determine whether the fibroblasts presented naturally or in response to M.R.'s subdural injuries; nor could she opine with reasonable certainty whether the adult fibroblast timeline also applies to children. However, Arangelovich opined that M.R.'s subdural injuries occurred within 24 hours of her death due to their color and lack of healing.

¶ 24    Teas testified that it was impossible to determine when M.R. sustained her subdural injuries because Arangelovich failed to take blood and tissue samples from the periphery of M.R.'s injuries, where healing typically begins. According to Teas, taking samples exclusively from the center of an injury does not provide necessary data to determine the

injury's age. Teas noted multiple signs of healing in Arangelovich's samples of M.R.'s subdural injuries. Teas opined that these signs of healing in the center of M.R.'s subdural injuries indicate that the injuries' periphery would likely show additional healing that would more accurately determine their age. From this evidence, Teas opined that M.R.'s subdural and subgaleal injuries were "definitely" more than 24 hours old when she died—M.R. sustained them before defendant "roughly" tucked her in on October 25. Teas also opined that Arangelovich's autopsy file did not definitively show that abuse, rather than accidental falls, caused M.R.'s fatal injuries.

¶ 25  At the close of evidence, the State tendered a jury instruction on involuntary manslaughter. Defense counsel conceded that defendant had no basis to object because involuntary manslaughter is a lesser-included offense of murder. The trial court issued the instruction. The jury acquitted defendant of murder and involuntary manslaughter but convicted him of child endangerment.

¶ 26  Defendant was 17 years old when M.R. died. His presentence report contained letters from friends, relatives, neighbors, and teachers who stated that defendant was a good kid who would never hurt anyone. Although defendant admitted during his police interview that he smoked marijuana, he had no criminal history. No witness testified that defendant abused M.R. prior to October 25, 2011. The trial court sentenced him to 42 months in prison. After defendant's sentencing hearing, the trial court denied his motion to reconsider. This appeal followed.

¶ 27                                        ANALYSIS

¶ 28  Defendant makes three arguments challenging his conviction. First, he claims that the State failed to prove him guilty beyond a reasonable doubt. Specifically, defendant argues that even if his actions proximately caused M.R.'s death (which he disputes), the State failed to prove defendant willfully or knowingly endangered M.R.'s life. Second, defendant asserts that the trial court erred by instructing the jury that child endangerment's state-of-mind element requires "willfully," rather than "knowingly," causing or permitting a child's life or health to be endangered. Defendant argues the trial court's misleading instruction constituted plain error or, in the alternative, his counsel provided ineffective assistance by failing to object. Finally, defendant claims the trial court denied him a public trial when it partially closed the courtroom during *voir dire* and, later in the trial, when it instructed journalism students to find a seat or leave the courtroom. We address each argument in turn.

¶ 29                           I. Sufficiency of the Evidence

¶ 30  When a defendant challenges the sufficiency of the evidence supporting his conviction, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the offense's essential elements proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). Reviewing courts do not retry defendants, reweigh trial evidence, or otherwise undermine the fact finder's judgment. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). A conviction will stand unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 31  The State charged defendant with felony child endangerment. The State had to prove that (1) M.R. was in defendant's care or custody, (2) defendant willfully caused or permitted

M.R.'s life to be endangered, and (3) defendant's acts proximately caused M.R.'s death. See 720 ILCS 5/12-21.6 (West 2010). Defendant claims that the State failed to prove that his actions proximately caused M.R.'s death or that he willfully endangered M.R.'s life.

¶ 32                                    A. Proximate Cause

¶ 33      In support of his proximate cause argument, defendant claims that he "presented a strong case that M.R.'s death was caused by an accidental fall," not by his action. He emphasizes Kayleigh's trial testimony stating that M.R. suffered head injuries from accidental falls before her death. He also highlights Dr. Teas's opinion that M.R.'s fatal injuries occurred more than 24 hours prior to her death, before defendant tucked her in "kind of roughly." Teas also opined that M.R.'s injuries did not show signs of abuse.

¶ 34      On the other hand, Dr. Arangelovich opined that M.R.'s fatal injuries occurred within 24 hours of her death. She also opined that abuse caused M.R.'s injuries. Combining Arangelovich's opinion with defendant's police interview, the State presented an "eggshell skull" theory; M.R.'s prior falls and medical issues made her more susceptible to fatal head trauma but did not cause her death. According to the State, defendant's admittedly aggressive act, tucking M.R. in "roughly," endangered her life and proximately caused her death.

¶ 35      Essentially, this issue turned on the jury's perception of opposing expert opinions. Other trial evidence and testimony did not overwhelmingly support either expert's opinion. Although testimony regarding M.R.'s prior falls tends to support Dr. Teas's opinion, Kayleigh did not disclose M.R.'s prior falls to police until her autopsy report concluded she was abused. The jury could have reasonably discredited this testimony. Moreover, Arangelovich agreed with Teas that M.R. had preexisting head injuries when she died; the experts disagreed as to whether new injuries caused her death.

¶ 36      The jury apparently agreed with Dr. Arangelovich. We do not find her expert opinion to be improbable, unsatisfactory, or inconclusive. See *Evans*, 209 Ill. 2d at 209. Viewing the evidence in the light most favorable to the State, we hold that the evidence sufficiently supported the jury's finding that defendant's actions proximately caused M.R.'s death.

¶ 37                                    B. State of Mind

¶ 38      Defendant argues that his videotaped police interview clearly demonstrates that, even if his actions proximately caused M.R.'s death, he did not willfully harm her. As defendant points out, acting "willfully," to satisfy the requisite mental culpability for child endangerment, is synonymous with acting "knowingly." *People v. Jordan*, 218 Ill. 2d 255, 270 (2006); see also 720 ILCS 5/4-5(b) (West 2012). A person acts "knowingly" when he or she knows that his or her conduct is practically certain to cause the result. *People v. Dorsey*, 2016 IL App (4th) 140734, ¶ 34 (citing *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992)). The jury may infer intent from circumstantial evidence. *People v. Williams*, 165 Ill. 2d 51, 64 (1995). "The defendant is presumed to intend the natural and probable consequences of his acts ***." *People v. Terrell*, 132 Ill. 2d 178, 204 (1989).

¶ 39      The trial evidence, viewed in the light most favorable to the State, showed that defendant knew his aggressive physical act toward his 26-month-old daughter endangered her life or health. Defendant acted on his own volition when he "roughly" tucked M.R. into her daybed. During his police interview, he demonstrated tucking M.R. in by using a stuffed teddy bear.

After defendant's first demonstration, he admitted that he tucked M.R. in harder than in the demonstration because he did not want to hurt the bear. During the second demonstration, defendant applied noticeably more force.

¶ 40    Defendant became frustrated because M.R. would not lie down for her nap, so he "roughly" forced her into her daybed. His apology to M.R. after forcing her into her daybed indicates that he knew he could have injured her. He also knew M.R.'s medical history and understood she might be more susceptible to injury than other infants. Based on the evidence, the jury could reasonably conclude that defendant willfully endangered M.R.'s life or health.

¶ 41                                      II. Jury Instruction

¶ 42    Defendant also argues that the trial court denied him a fair trial by issuing an erroneous child endangerment jury instruction. Following Illinois Pattern Jury Instructions, Criminal, Nos. 11.29, 11.30 (4th ed. 2000) (hereinafter IPI Criminal 4th), the instruction stated that defendant should be found guilty of child endangerment if the jury concluded, beyond a reasonable doubt, that he assumed care or custody over M.R., "willfully caused or permitted" M.R.'s life to be endangered, and his acts proximately caused M.R.'s death. The trial court did not tender IPI Criminal 4th No. 5.01B, which states: "Conduct performed knowingly or with knowledge is performed willfully." Defense counsel made no objection. Defendant claims that the instruction's use of "willfully" rather than "knowingly" in the absence of IPI Criminal 4th No. 5.01B was plain error. Alternatively, defendant argues that counsel provided ineffective assistance by not objecting to the allegedly erroneous instruction.

¶ 43    Illinois Supreme Court Rule 451(c) (eff. July 1, 2006) states that "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." Rule 451(c) is coextensive with the plain-error clause in Illinois Supreme Court Rule 615(a). *People v. Keene*, 169 Ill. 2d 1, 32 (1995); *People v. Jackson*, 2015 IL App (3d) 140300, ¶ 53 n.3. Defendant must demonstrate that the trial court's instruction constituted "clear or obvious error" that denied him a fair trial. *People v. Downs*, 2015 IL 117934, ¶¶ 14-15; see also Ill. S. Ct. R. 615(a). A fair trial is not necessarily a perfect trial. *People v. Herron*, 215 Ill. 2d 167, 177 (2005).

¶ 44    For over a decade, Illinois courts have held "willful" conduct to be synonymous with "knowing" conduct for child endangerment offenses. *Jordan*, 218 Ill. 2d at 270. Between M.R.'s date of death (October 26, 2011) and defendant's trial (November 18, 2013), the General Assembly codified *Jordan* by changing the requisite state of mind for child endangerment from "willful" to "knowing." Pub. Act 97-1109, §§ 1-5 (eff. Jan. 1, 2013); compare 720 ILCS 5/12-21.6 (West 2010), with 720 ILCS 5/12C-5 (West 2012). However, the amendment did not substantively change the law; "willful" and "knowing" reflect the same state of mind for child endangerment offenses.

¶ 45    At its core, defendant's challenge argues that the jury reached inconsistent verdicts. The crux of defendant's argument is that the term "willfully" conveyed to the jury a less culpable state-of-mind requirement than "knowingly." By finding defendant not guilty of murder, the jury concluded defendant did not "know" his actions would likely kill M.R. or cause her great bodily harm. Based on the murder verdict, defendant claims the jury would not have concluded he "knowingly" endangered M.R.'s life or health.

¶ 46    Defendants may not challenge a jury's verdict by claiming it is inconsistent. *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003). When a jury's verdict is inconsistent, "it is unclear

- 7 -

whose ox has been gored." *United States v. Powell*, 469 U.S. 57, 65 (1984). A court can only speculate as to the jury's rationale in reaching its verdict without impermissibly injecting itself into the jury's deliberations. *Id.* at 65-66. Further, appellate courts' authority to independently review the sufficiency of the prosecution's evidence guards against unlawful convictions. *Id.* at 67.

¶ 47    Here, we determined the State's evidence sufficiently supported defendant's child endangerment conviction. We decline defendant's invitation to speculate as to whether the jury would have reached a different verdict had the instruction said "knowingly" rather than "willfully." In fact, the evidence sufficiently supported a murder conviction; we cannot know whether the verdict was the result of juror lenity to defendant's benefit or the jury's interpretation of an instruction to his detriment. Regardless, the trial court's instruction accurately stated the law—"willfully" and "knowingly" are synonymous in child endangerment cases. We do not find the trial court's instruction to be "clear or obvious error." *Downs*, 2015 IL 117934, ¶ 15. Nor do we find that counsel provided ineffective assistance by failing to object to a jury instruction that accurately stated the law.

¶ 48                                    III. Public Trial

¶ 49    Defendant's final argument asserts that the trial court violated his right to a public trial (U.S. Const., amend. VI) when it partially closed the courtroom during *voir dire* and, while the State presented its evidence, asked journalism students to find a seat or leave the courtroom.

¶ 50    Prior to bringing over 90 potential jurors into the courtroom, the trial court recognized that jury selection is a public proceeding but the courtroom could not accommodate the potential jurors and the large congregation of citizens attending the proceedings. The trial court also expressed concern that the citizens with "emotions running high" risked contaminating the jury pool. The court ordered a partial closure during jury selection; two people who supported defendant and two who did not could remain in the courtroom and sit behind the potential jurors.

¶ 51    Later in the trial, prior to the State playing defendant's videotaped police interview, the court asked journalism students in attendance to find a seat or leave the courtroom. The record does not indicate whether any student left the courtroom; we cannot know whether a closure occurred. We find that without proof a student left the courtroom, the court's admonishment cannot support defendant's public trial claim. We address only the partial closure during *voir dire* below.

¶ 52    Defendant admits that neither he nor his counsel objected to the court's partial closure. He maintains that his failure to object creates neither a knowing and voluntary waiver of his public trial right nor a forfeiture of the issue on appeal. Even if he forfeited the issue, defendant argues the partial closure constituted second-prong plain error, an error so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. Ill. S. Ct. R. 615(a); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007).

¶ 53    Defendant's multilayered argument requires some unpeeling before addressing the fruit of its merit. First, we agree that defendant's failure to object to the trial court's partial closure did not amount to a knowing, intelligent, and voluntary waiver of his right to a public trial. See *Walton v. Briley*, 361 F.3d 431, 433-34 (7th Cir. 2004). Had defendant waived his public

trial right, our analysis would be complete. See *People v. Bannister*, 232 Ill. 2d 52, 71 (2008).

¶ 54 Although defendant did not waive his right to a public trial, he forfeited the issue on appeal by not contemporaneously objecting or raising the issue in a posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). We must determine whether our plain-error doctrine excepts defendant's forfeiture. To constitute second-prong plain error, the alleged error must deprive the defendant of a fundamentally fair trial or undermine the integrity of the judicial process. Ill. S. Ct. R. 615(a); *Piatkowski*, 225 Ill. 2d at 564-65.

¶ 55 Because public trial rights are "structural," violations are not subject to harmless error analysis. *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1907-08 (2017); *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984). However, other than the government's prohibition from arguing an error was harmless, "the term 'structural error' carries with it no talismanic significance as a doctrinal matter." *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1910.

¶ 56 Despite not being subject to harmless error analysis, public trial violations are subject to a "triviality standard." *Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996). "A triviality standard, properly understood," looks to "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment." *Id.* The protections conferred by the public trial guarantee are (1) to ensure a fair trial, (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) to encourage witnesses to come forward, and (4) to discourage perjury. *Waller*, 467 U.S. at 46-47. Not every courtroom closure results in an unfair trial, nor does each closure affect the values underlying the sixth amendment's public trial guarantee. See *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1910.

¶ 57 Defendant argues that automatic reversal is required where a court excludes anyone from a public proceeding unless (1) the party seeking to close the proceedings advances an overriding interest that is likely to be prejudiced, (2) the closure is no broader than necessary to protect that interest, (3) the trial court considers reasonable alternatives to closing the proceeding, and (4) the trial court makes findings adequate to support the closure. See *Waller*, 467 U.S. at 48. Further, defendant cites *People v. Evans*, 2016 IL App (1st) 142190, ¶ 18, for the proposition that a courtroom's limited seating is not an "overriding interest" justifying excluding any citizen from a proceeding. However, *Evans* is distinguishable from this case in two ways. First, defense counsel in *Evans* contemporaneously objected to the closure. Second, the *Evans* trial court maintained a standard practice of closing the courtroom during *voir dire*. Here, counsel did not object to the partial closure, and the trial court's partial closure was, according to the record, prompted by unusually large public attendance in this specific case.

¶ 58 The United States Supreme Court has recently recognized that the problems trial courts face "in deciding whether some closures are necessary, or even in deciding which members of the public should be admitted when seats are scarce, are difficult ones." *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1909. The Court also recognized that potential errors in making these difficult decisions can be cured or more thoroughly addressed when a defendant contemporaneously objects to a courtroom closure. *Id.* at ___, 137 S. Ct. at 1909-10. In other words, without contemporaneous objection, the trial court would not likely cure a violation or formally express its findings on the record.

¶ 59 In this case, the trial court's partial closure neither deprived defendant of a fair trial nor undermined the integrity of the judicial process. The partial closure implicated none of the values underlying defendant's right to a public trial. Four citizens, not including the jury, remained in the courtroom during *voir dire*, and the courtroom was open to all citizens for the remainder of defendant's trial. Defendant raises "no suggestion that any juror lied during *voir dire*; no suggestion of misbehavior by the prosecutor, judge, or any other party; and no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands." *Id.* at ___, 137 S. Ct. at 1913.

¶ 60 We hold that the trial court's partial closure during *voir dire* was trivial. Defendant does not suggest, nor does the record indicate, that the partial closure implicated a single value the public trial guarantee aims to protect. Defendant's claim that a courtroom's available seats can never justify a closure defies reality and would, if accepted, stifle courts' duty to administer justice. Absent clear error, defendant is not entitled to automatic reversal based upon a constitutional claim for which we have little record due to his failure to object: "Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal." *Levine v. United States*, 362 U.S. 610, 619-20 (1960). We see no clear error in this case.

¶ 61                                    CONCLUSION

¶ 62 For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 63 Affirmed.

¶ 64 JUSTICE McDADE, dissenting:

¶ 65 Defendant argues, *inter alia*, that his right to a public trial was violated when the trial court excluded all but four members of the public from the *voir dire* proceeding and, later, ordered journalism students to leave the courtroom during the trial. I agree with the majority that we cannot determine if a closure occurred when the court ordered the journalism students to leave the courtroom because the record is unclear on whether they actually left. However, I disagree with the majority's finding that defendant's right to a public trial was not violated when the trial court excluded members of the public from *voir dire*.

¶ 66 The facts show that the trial court decided—without a request from either party or the consent of the defendant—to close the entire *voir dire* proceedings to members of the public except two individuals from defendant's family and two individuals from the victim's family. The court reasoned that, because of its preference to seat the entire jury venire in the courtroom at once, there were only enough remaining seats to accommodate four members of the public.

¶ 67 Our society has a strong interest in public trials. *Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979). In a public trial, " 'the public may see [a defendant] is fairly dealt with and not unjustly condemned, and *** the presence of interested spectators may keep his triers keenly alive to a sense of their responsibilities and to the importance of their functions.' "

(Internal quotation marks omitted.) *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *In re Oliver*, 333 U.S. 257, 270 n.25 (1948)). A public trial also "encourages witnesses to come forward and discourages perjury." *Id.* The sixth amendment's right to a public trial was created for the benefit of the defendant, and a court cannot deprive defendant of this right without his consent. *Id.*; *People v. Harris*, 302 Ill. 590, 592-93 (1922). The right to a public trial extends to *voir dire* proceedings. *Presley v. Georgia*, 558 U.S. 209, 212-13 (2010).

¶ 68     "While all trials are presumed to be open, the right is not absolute." *People v. Burman*, 2013 IL App (2d) 110807, ¶ 51. To justify closing a trial proceeding, we examine whether (1) there exists an "overriding interest that is likely to be prejudiced," (2) the closure is no broader than necessary to protect that interest, (3) the trial court considered "reasonable alternatives" to closing the proceeding, and (4) the trial court made adequate findings to support the closure. (Internal quotation marks omitted.) *People v. Evans*, 2016 IL App (1st) 142190, ¶ 10 (quoting *People v. Willis*, 274 Ill. App. 3d 551, 553 (1995), quoting *Waller*, 467 U.S. at 48). The overriding interest required by *Waller* also applies to partial closures. *People v. Cooper*, 365 Ill. App. 3d 278, 282 (2006) (citing *People v. Taylor*, 244 Ill. App. 3d 460, 464 (1993)). The majority touches on *Waller*'s overriding interest and other factors in addressing defendant's argument, but I believe additional analysis is necessary in determining whether the closure was justified.

¶ 69     Considering the *Waller* factors, I would find that the closure was not justified for three reasons. First, the reason the court gave for deciding to exclude nearly all members of the public from *voir dire* was that it wanted to seat the entire venire in the courtroom and "[t]here's only so many seats." This is not an overriding interest. Having the entire venire in the courtroom at the same time is a function of the court's preference and convenience—factors that surely do not override a defendant's constitutional right to a fair and public trial. Moreover, the issue of the number of seats in a courtroom is "solely a matter of logistics and convenience for courtroom personnel" and "has no positive effect on the fairness of the trial." *Evans*, 2016 IL App (1st) 142190, ¶ 12. Also, although defendant challenges the trial court's closure solely as violative of his rights under the sixth amendment, the excluded spectators, who had chosen to attend and to observe the proceedings, also had a constitutional interest in an open trial. The Supreme Court has held that the right to a public trial "extends beyond the accused and can be invoked under the First Amendment." *Presley*, 558 U.S. at 212 (citing *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984)). It is also well established that the "Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46.

¶ 70     Second, the court did not articulate adequate findings to support the closure. Indeed, it articulated *no* findings; it removed the public because it wanted to do so. The court cannot arbitrarily burden a defendant's right to a fair trial or the implicit first amendment right of the public and press to an open trial. It must identify an interest that overrides those rights and articulate " 'findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Presley*, 558 U.S. at 215 (quoting *Press-Enterprise Co.*, 464 U.S. at 510). Here, the court's stated reason does not even pretend to identify an "overriding" need served only by having the entire venire present in the courtroom at the same time and moving the public out because of the resulting lack of seats. Nor does the court indicate how such an interest would be prejudiced by, for example, working with

- 11 -

panels, or other smaller configurations, of jurors. It is impossible to ascertain from the court's simple statement what overriding interest was at stake and how that interest would be prejudiced without the nearly total exclusion of the public from the jury selection proceedings.

¶ 71    Third, the court failed to consider any reasonable alternative to its partial closure. "Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id.* Here, if a larger courtroom that could seat the venire and the public was unavailable, the court could have called the jurors into the room in smaller groups or asked individuals to stand until the size of the venire was reduced and seating became available. See *Evans*, 2016 IL App (1st) 142190, ¶ 15. If the courthouse has no courtrooms large enough to accommodate the public, the press, and the entire venire, perhaps the county should look into enhanced audio or other technology.

¶ 72    The majority finds *Evans* inapplicable because the defense counsel in *Evans* objected to the closure whereas no objection was made in this case.[1] *Evans*, 2016 IL App (1st) 142190, ¶ 3. I do not see how this distinction is relevant. A failure to object does not preclude this court from reviewing defendant's constitutional claim for plain error. See *People v. Jones*, 2014 IL App (1st) 120927, ¶ 40 (although defendant failed to object to the closure, the reviewing court analyzed defendant's constitutional challenge for plain error). Furthermore, the trial court has a responsibility to ensure defendant receives a fair trial, and defendant's failure to object should not relieve it of this responsibility. See *Evans*, 2016 IL App (1st) 142190, ¶ 14 ("Given the seriousness of the potential harm, each trial judge must be alert and proactive in managing his or her courtroom to prevent violations of this core constitutional right, regardless of whether attorneys assist in the process.").

¶ 73    The majority also finds that the partial closure was trivial because defendant did not provide evidence that he was denied the constitutional protections listed above. The majority further states that the record is devoid of evidence that the partial closure violated defendant's constitutional protections. Illinois courts have found that a temporary closure was "trivial" when the closure was brief or minimal. See *Jones*, 2014 IL App (1st) 120927, ¶ 45 (finding that the trial court's brief *in camera* questioning of two potential jurors was trivial); *People v. Webb*, 267 Ill. App. 3d 954, 959 (1994) (holding that the closure was trivial because spectator missed "a few minutes of discussion" at trial); see also *Peterson v. Williams*, 85 F.3d 39, 44 (2d Cir. 1996) (ruling that defendant's sixth amendment rights were not violated because the closure was "extremely short," the spectators were given a follow-up summation, and the closure was inadvertent). However, closure is not trivial when it occurs for the entirety of the *voir dire* proceedings. See *Evans*, 2016 IL App (1st) 142190, ¶ 17 ("What occurred here is in no way a 'trivial' closure. Ms. Peterson missed the entirety of jury selection, including questioning of potential jurors and a number of peremptory challenges.").

---

[1]The majority also states that *Evans* is inapplicable to this case because "the *Evans* trial court maintained a standard practice of closing the courtroom during *voir dire*." *Supra* ¶ 57. My reading of *Evans* does not reveal any basis for this statement. In *Evans*, the reviewing court speaks of one instance in which the defendant's step-grandmother was asked to leave the courtroom before *voir dire* proceedings. *Evans*, 2016 IL App (1st) 142190, ¶¶ 3-4. There is no reference to the trial court's standard practice of closing the courtroom in *Evans*.

¶ 74 Here, the trial court excluded all spectators except four individuals prior to the *voir dire* proceedings, and the excluded spectators were denied an opportunity to view any portion of the proceedings. This closure was not trivial or *de minimis*; it was a nearly complete denial of defendant's right to have the public present for the *voir dire* of prospective jurors. *Id.* Therefore, I would hold that an error occurred, enabling plain-error review because the trial court violated defendant's right to a public trial.

¶ 75 Defendant asserts that the trial court's violation constituted second-prong plain error. The majority applies the *Weaver* Court's ruling to defendant's challenge under the second prong of plain-error review and finds that defendant did not show that the partial closure affected the fairness of his trial and the integrity of the judicial process. See *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1911 (2017). I disagree with the majority's decision. The Court in *Weaver* determined that, although a violation of the right to a public trial is structural error, the automatic reversal requirement does not extend to the *Strickland* test because the violation does not always lead to a fundamentally unfair trial as is necessary to meet the prejudice prong. *Id.* at ___, 137 S. Ct. at 1911 ("when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically").

¶ 76 The *Strickland* test is not at issue in this case. It is well established that a violation of a defendant's right to a public trial is structural error. The United States Supreme Court established that a violation of a public trial is structural because of the " 'difficulty of assessing the effect of the error.' " *Id.* at ___, 137 S. Ct. at 1910 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 (2006)). The Court further found that the violation is structural error because it protects the interest of the public at large, the press, and the defendant. *Id.* at ___, 137 S. Ct. at 1910 (citing *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 508-10 (1984)). The Illinois Supreme Court also recognized that a violation of the right to a public trial is structural error (*Thompson*, 238 Ill. 2d at 609) and that automatic reversal is required when an error is deemed "structural" (*People v. Glasper*, 234 Ill. 2d 173, 197 (2006)).

¶ 77 Our supreme court "equated the second prong of plain-error review with structural error." *Thompson*, 238 Ill. 2d at 613. The court further classified structural error as "a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " (Internal quotation marks omitted.) *Id.* at 614 (quoting *Glasper*, 234 Ill. 2d at 197-98). In other words, a violation of the right to a public trial, in essence, affects the fairness of the defendant's trial and undermines the integrity of the judicial process as required under the second prong of plain-error review. As stated previously, I would find that the trial court violated defendant's right to a public trial and that this violation is structural error. Based on our supreme court's ruling, I would find that defendant met the second prong of plain-error review. Because automatic reversal is required when an error is deemed structural and because the evidence, reviewed in the light most favorable to the State, was sufficient to find defendant guilty beyond a reasonable doubt, I would reverse defendant's conviction and remand for a new trial. *People v. Willis*, 274 Ill. App. 3d 551, 554 (1995) ("The sixth amendment protects all portions of the trial, including *voir dire*, and the appropriate remedy for improper closure is a new trial.").