# Illinois Official Reports

## Appellate Court

## *People v. Smith*, 2020 IL App (3d) 160454

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW SMITH, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-16-0454 |
| Filed | February 11, 2020 |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 15-CF-407; the Hon. Cynthia M. Raccuglia, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Steven Varel, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Karen Donnelly, State's Attorney, of Ottawa (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Presiding Justice Lytton concurred in the judgment and opinion.<br>Justice O'Brien concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1 Following a jury trial, defendant, Andrew Smith, was convicted of forgery (720 ILCS 5/17-3(a)(3) (West 2014)), possession of a weapon by a felon (*id.* § 24-1.1(a)), and aggravated fleeing and eluding (625 ILCS 5/11-204.1(a)(4) (West 2014)). Defendant appeals his convictions and argues that the trial court erred by (1) failing to admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), (2) failing to properly admonish jurors during *voir dire*, and (3) closing the courtroom during *voir dire*. Additionally, the defendant challenges the sufficiency of the evidence relating to his conviction of unlawful possession of a firearm by a felon. In the alternative, if we affirm his convictions, defendant argues his sentence was improper. We reverse and remand for a new trial.

¶ 2                                    I. BACKGROUND
¶ 3                                  A. High-Speed Chase
¶ 4 Brothers Andrew and Jeremiah Smith engaged in a nationwide crime spree that involved passing counterfeit bills as they traveled from state to state. The brothers began their criminal endeavor in Pennsylvania with the goal of reaching Colorado. However, according to Andrew, he was not able to tolerate his brother's incessant drinking during the trip. The brothers turned around in Nebraska to return Jeremiah to Pennsylvania. Andrew stated it was his intention to travel to Alaska after dropping his brother off. On the way back to Pennsylvania, the brothers traveled through Illinois.

¶ 5 On October 13, 2015, at approximately 1:30 p.m., Officer Robert Cessna of the Tri-DENT Drug Task Force observed a black Nissan heading eastbound on Interstate 80. Cessna's radar gun indicated the vehicle was speeding and a traffic stop ensued. Cessna approached the passenger side of the vehicle, and the passenger rolled down his window. Cessna identified the driver as defendant, Andrew Smith, and the passenger as Jeremiah Smith. He also observed several empty beer cans along the floorboards of the Nissan and smelled a strong odor of alcohol emanating from the vehicle. Shortly after the stop was initiated, another officer arrived to assist. This officer provided the services of a drug sniffing canine and performed a free-air sniff on the vehicle. The canine alerted to the presence of narcotics. Cessna asked the defendant to step out of the vehicle, so he could perform a search. Defendant instead sped away.

¶ 6 Defendant led police on a high-speed chase through the La Salle-Peru area of La Salle County, while ignoring numerous traffic control signals. During the chase, the passenger held a white bag out of the window of the vehicle as if he planned to throw it out. However, the passenger did not throw the bag from the vehicle at that time. Officers eventually lost sight of the Nissan. Dispatch relayed that the vehicle had been found abandoned on Canal Street in La Salle. The vehicle was towed to an impound lot to be searched later. Officers received reports that two individuals had been seen swimming across the nearby I&M canal. Officers searched the area on ATVs, eventually apprehending defendant and his brother.

¶ 7 Sergeant Scott Samolinski of the La Salle Police Department returned to the area where Cessna had lost visual contact with the Nissan during the chase. Along the route between where Cessna had lost visual and where the vehicle was abandoned, Samolinski found a blue bag that contained an unloaded shotgun. Samolinski also found a white bag similar to the one that was

being held out of the window of the Nissan during the high-speed chase. The white bag was one block away from the blue bag and contained an additional unloaded shotgun.

¶ 8        Officers searched the Nissan and found an HP color printer, 92 counterfeit $20 bills, and a counterfeit $10 bill. A majority of the bills were uncut on single sheets of paper, while officers did find some "loose" $20 bills. Many of the bills shared the same serial numbers. Officers also found suitcases, clothing, a large amount of camping gear, and a small amount of cannabis and paraphernalia. Investigators at the local jail searched through the items that had been removed from defendant's person. Defendant's wallet was among the items seized and contained a torn, counterfeit $20 bill with the ink running off of it. The bill had the same serial number as some of the other counterfeit bills found in the Nissan.

¶ 9        Defendant was charged by superseding indictment with forgery, unlawful possession of a weapon by a felon, aggravated fleeing or attempting to elude a police officer, and aggravated possession of stolen firearms. Defendant's brother, Jeremiah, was charged as a codefendant with forgery and unlawful possession of a weapon by a felon.

¶ 10                                       B. Pretrial

¶ 11        Defendant's first appearance in court was on October 15, 2015. The prosecutor read the forgery and aggravated fleeing or attempting to elude a police officer charges aloud. The court admonished defendant as follows:

> "THE COURT: All right. Mr. Andrew Smith, you have here a Count I of forgery, a Class 3 felony. And you could be sentenced between two and five years in the Department of Corrections, with a mandatory supervised release period of one year. It is a probational offense.
>
> The same as to Count II.
>
> Now, Count III is aggravated fleeing and eluding.
>
> Is he eligible for extended term, if they're convicted felons—?
>
> MR. TOWNE [(STATE'S ATTORNEY)]: Yes, Your Honor.
> ***
> THE COURT: What about the Class 3?
>
> MR. TOWNE: Yes. Both of them have burglary convictions, Class 2's.
>
> THE COURT: Then I didn't realize that. So here we go. ***.
>
> THE COURT: Now Mr. Smith—Andrew Smith—you could be sentenced between—on the first two counts of a Class 3—between two and ten years in the Department of Corrections, with a mandatory supervised release period thereafter of one year.
>
> On the Count IV, you could be sentenced between one and six years in the Department of Corrections, with a mandatory supervised release period of one year. And this is a probational offense.
>
> Now, when he says investigation continues, that means, for both of you, there could be other charges related to weapons or other things that could be in additional counts."

The court then appointed the public defender to represent the defendant.

¶ 12        On December 10, 2015, the defendant appeared in court on the State's notice. The State tendered additional charges to the court including, *inter alia*, unlawful possession of a weapon

by a felon and aggravated possession of a stolen firearm. Defendant and his counsel were present and responded.

> "MR. CAPPELLINI [(DEFENSE COUNSEL)]: We acknowledge receipt of a copy of Count IV, Count V, Count VI, waive a reading of each of those counts and explanation of possible penalties therefore, enter a plea of not guilty to each count, and we would ask that it stay on the trial call as well."

¶ 13 Defendant, again, appeared in court in January of 2016. He was disgruntled with his appointed attorney and asked the court to appoint new counsel. Defendant complained that his attorney had failed to subpoena the wife of then La Salle County State's Attorney, former Governor Pat Quinn, and then current Governor Bruce Rauner. The court denied defendant's request for new counsel. He asked to proceed *pro se* later that same month. However, the court *sua sponte* found a *bona fide* doubt as to defendant's competence based on his behavior in court and irrational requests. The court held the motion to proceed *pro se* in abeyance until it could be determined whether defendant was fit to stand trial and severed the case from his brother's. Jeremiah would later enter into a guilty plea.

¶ 14 The matter proceeded to a jury trial on the issue of fitness. Dr. Jean Cole testified. She had evaluated defendant and found him fit to stand trial. During her evaluation, she had conversations with the defendant about representing himself. The defendant was able to identify and describe all the different roles of individuals involved in the court system, understood his rights, and understood what evidence might be brought against him and how to defend himself. Subsequently, a jury found defendant fit to stand trial.

¶ 15 On April 21, 2016, defendant, again, requested to proceed *pro se*, stating, "I will not go to trial with this man," referring to his court-appointed counsel. The court admonished defendant extensively about the severe disadvantage he would face representing himself and warned that he would not be able to revert course during the trial; defendant stated he understood. Defendant was allowed to waive counsel and proceed *pro se*. The trial court did not admonish defendant about the nature of the charges, the minimum or maximum sentence he faced, or the possibility of consecutive sentences.

¶ 16 On April 25, 2016, the court admonished defendant as to the charges he faced and the corresponding sentencing ranges. The court explained there was a possibility the sentences could run consecutively and the possibility of extended-term sentences. The maximum prison sentence defendant faced was 40 years, given certain findings. Defendant did not request appointed counsel and he did not state a lack of understanding of the charges. Instead, defendant immediately started arguing his motion to dismiss because of an alleged speedy-trial violation.

¶ 17                                                                 C. Jury Selection

¶ 18 Before the venire was brought into the courtroom, the court noted that the defendant's parents were present in the courtroom. The court excluded defendant's father due to a previous order excluding witnesses. The court then asked defendant's mother to step out because "[t]he jury needs the space."

¶ 19 During *voir dire*, the court questioned two members of the venire who ultimately served on the jury. Regarding Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the trial court inquired:

"THE COURT: Now, in a criminal case, and this is the most important law in a criminal case. And you will get other law at the end that I will instruct you as to. But, it's important for you to understand that a defendant in a criminal case is presumed innocent. And that presumption of innocence exists throughout the trial.

The defendant does not have to present any evidence. He doesn't have to testify. And if he does not, you cannot assume anything by that.

You must look at this case as to whether the defendant—or the State has proved the defendant guilty beyond a reasonable doubt.

Now, Ms. Alonzo, do you have any problem with the principle of law?

* * *

JUROR ALONZO: No.

THE COURT: Do you accept, and will you accept and apply that principle and agree with that principle of law?

JUROR ALONZO: Yeah."

¶ 20 The trial court then proceeded to ask the rest of the venire if they agreed with and accepted the principle of law, to which they responded in the affirmative.

¶ 21                                    D. Jury Trial

¶ 22 At trial, the State introduced into evidence a certified copy of the defendant's 2009 Pennsylvania felony conviction for burglary. Officers Cesna and Samolinski testified to what they witnessed on October 13, 2015, as recounted above. *Supra* ¶¶ 5-8.

¶ 23 Defendant's brother also testified. He stated that the two shotguns thrown from the car were his. He never told defendant that he had the shotguns in the vehicle. According to Jeremiah, the defendant would have never allowed him to have the guns inside the car. Jeremiah admitted that he had difficulty remembering the day in question and the days leading up to it because he had been drinking heavily during that time. While he could not remember the incident, he assumed the guns were in the vehicle with him on that day. He stated the guns were probably with his stuff and must have been in his possession.

¶ 24 At the conclusion of the State's case, defendant made a motion to dismiss the "gun charges," which was construed as a motion for a directed verdict. Defendant argued that since his brother had admitted to ownership of the guns, the "gun charges" should be dismissed. The State responded by pointing out that the theory underlying the possession charges was not that defendant had exclusive possession but that there was joint possession. The court denied defendant's motion.

¶ 25 Defendant testified. He acknowledged the 2009 felony conviction for robbery in Pennsylvania. He admitted to fleeing from Cessna during the traffic stop. Defendant denied knowing that the guns were in his car. He did not agree with his brother's decision to place the guns inside the vehicle and denied ever seeing the bags in which they were contained. His possessions inside of the car consisted of merely all the "camping gear." He also denied having any counterfeit money in his wallet.

¶ 26 During defendant's case, he elicited testimony from one of the investigators about how they had contacted the United States Secret Service about the counterfeit bills. After due diligence, the U.S. Secret Service agent determined that the serial numbers found on the bills in defendant's possession had been used "in other locations in the United States."

¶ 27    The jury acquitted defendant on the charge of aggravated possession of stolen firearms but convicted him on all other counts. Defendant filed a posttrial motion for a new trial that was denied.

¶ 28                                E. Sentencing

¶ 29    In preparation for sentencing, a presentence investigation (PSI) report was prepared. The PSI detailed that defendant's criminal history stretched across three states and included convictions for the following charges: six burglaries, two driving under the influence, robbery, attempted burglary, attempted theft, receiving stolen property, unlawful possession of a controlled substance, resisting/obstructing, carrying a concealed weapon, criminal trespass, and harassment. The trial court sentenced defendant to concurrent prison terms of eight years for forgery and eight years for unlawful possession of a weapon by a felon. The court added a consecutive term of six years for the aggravated fleeing charge, finding it was necessary to deter others from this type of crime and that defendant was a danger to the public. The court then admonished defendant as follows:

> "THE COURT: Now, this is a final and appealable order but in order to appeal you need to file in this matter a motion for—you have to see me one more time—a motion to reconsider your sentence that I rendered in this court thirty days from today's date or you waive any further appeal rights.
>
> Now, you have already perfected your appeal on the jury verdict but you still—if you want to fight your sentence you have to file a motion to reconsider your verdict.
>
> MR. SMITH [(DEFENDANT)]: That's not true, Your Honor.
>
> THE COURT: Well, I'll let you do what you want. Everything—
>
> MR. SMITH: I have to file a notice of appeal right here the day I get sentenced.
>
> THE COURT: Not if you want to reconsider your sentence.
>
> MR. SMITH: That is not how it works. I'm not trying to reconsider my sentence, Your Honor, I'm going to the Appellate Court.
>
> ***
>
> THE COURT: Do you want to appeal your sentence?
>
> MR. SMITH: No, I'm not appealing my sentence."

¶ 30    This appeal followed.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, defendant argues (1) the evidence was insufficient to find him guilty of unlawful possession of a firearm by a felon, (2) he is entitled to a new trial because the trial court failed to ask two jurors if they understood the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)) codified in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (3) the trial court failed to properly admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), (4) the trial court violated his constitutional right to a public trial, and (5) in the alternative, his sentence for aggravated fleeing or attempting to elude a police office should be reduced to the maximum authorized nonextended-term sentence of three years. The State asks us to affirm the trial court.

¶ 33                                   A. Sufficiency of the Evidence

¶ 34         "When a defendant challenges the sufficiency of the evidence supporting his conviction, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the offense's essential elements proven beyond a reasonable doubt." *People v. Radford*, 2018 IL App (3d) 140404, ¶ 30 (citing *People v. Pollock*, 202 Ill. 2d 189, 217 (2002)). "Circumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged." (Internal quotation marks omitted.) *People v. Nesbit*, 398 Ill. App. 3d 200, 209 (2010). It is not the function of this court to retry the defendant, reweigh trial evidence, or otherwise undermine the fact finder's judgment. *Radford*, 2018 IL App (3d) 140404, ¶ 30. "A conviction will stand unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt." *Id.* (citing *People v. Evans*, 209 Ill. 2d 194, 209 (2004)).

¶ 35         In order for the defendant to be found guilty of unlawful possession of a firearm by a felon, the State needed to prove he "knowingly possess[ed]" a firearm on or about his person and had previously been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2014). Defendant does not contest that he was previously convicted of a felony before he was charged with the instant offense. Defendant claims the State failed to show he was in possession of the firearms. Thus, the only issue is whether the evidence presented at trial was sufficient to support a reasonable inference that he knowingly possessed the firearms.

¶ 36         The State in this instance based its case on the theory that defendant had constructive possession of the firearms. Where the possession is constructive, the State must prove that defendant (1) had knowledge of the presence of the weapon and (2) had immediate and exclusive control over the area where the weapon was found. *Nesbit*, 398 Ill. App. 3d at 209. Defendant's knowledge of the presence of the weapons is at issue, since his ownership of the Nissan is undisputed. " 'The element of knowledge may, and most often must, be proved by circumstantial evidence.' " *People v. Ingram*, 389 Ill. App. 3d 897, 900 (2009) (quoting *People v. Rangel*, 163 Ill. App. 3d 730, 739 (1987)).

¶ 37         Defendant's presence in the vehicle, without more, is not evidence that he knew the weapons were in the vehicle. See *People v. Bailey*, 333 Ill. App. 3d 888, 891 (2002). However,

> "[k]nowledge may be 'inferred from several factors, including: (1) the visibility of the weapon from defendant's location in the vehicle, (2) the amount of time in which defendant had an opportunity to observe the weapon, (3) gestures or movements made by defendant that would suggest an effort to retrieve or conceal the weapon, and (4) the size of the weapon.' " *Nesbit*, 398 Ill. App. 3d at 209 (quoting *Ingram*, 389 Ill. App. 3d at 900).

¶ 38         The two brothers drove cross-country, spending a significant amount of time in the car and stopping at multiple hotels. There was also camping gear in the car. This would lead to the reasonable inferences that when stopping for the night, the car would either be unloaded to camp or to spend the night at a hotel. Given this and the amount of time on the road, it is unlikely defendant would not have come across the shotguns. These were full-sized, pump-action shotguns. Defendant's vehicle did not have a trunk where the weapons could be hidden. The shotguns would have taken up a significant amount of space and could not have been concealed inside of the vehicle. The shotguns were stored in open ended bags, the type a collapsible lawn chair would be stored in. These bags were mere cloth and would not have

- 7 -

obscured the identity of the shotguns stored within. The ability of defendant's brother to secure the bags during the high-speed chase to throw them out of the vehicle evidences the fact that they were readily retrievable. The close proximity of the bags, being found only one block apart, buttresses the inference that both bags were readily retrievable as the distance of one block is quickly covered in a speeding vehicle. The presence of two shotguns, and not one, leads to the inference that one was for each occupant of the vehicle while they were engaging in criminal activity during their road trip across the country.

¶ 39 Defendant points us to his and his brother's testimony to support the contention that the evidence is insufficient to uphold the conviction. However, his brother admitted on the stand that he had consumed copious amounts of alcohol not only in the days leading up to the incident, but also the day of the incident, and did not remember the incident itself. One could not fault a jury for not taking this testimony as the uncontroverted truth.

¶ 40 Defendant also relies on *People v. McIntyre*, 2011 IL App (2d) 100889. We dismiss his reliance on that case out of hand due to the substantial factual differences between it and the instant case. The *McIntyre* court stated, "even in cases where there is joint possession, the evidence must support a conclusion that the defendant had control, or the ability to exercise control, over the contraband." *Id.* ¶ 17. As laid out above, defendant had the ability during the cross-country trip and the high-speed chase to exercise control over the weapons.

¶ 41 Viewing the evidence in the light most favorable to the prosecution, the State presented sufficient evidence to allow the jury to conclude that defendant had constructive possession of the weapons. We have no basis to disturb that determination.

¶ 42            B. *Zehr* Principles

¶ 43 Defendant also argues that the trial court improperly admonished jurors on the *Zehr* principles. Defendant concedes that he forfeited this issue by failing to raise an objection at trial or raise the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1998). However, defendant requests that we review the issue under the first prong of the plain-error doctrine and claims we will find the evidence closely balanced, "at least" as to the offense of unlawful possession of a weapon by a felon. The State argues substantial compliance, and in the alternative, avers the evidence was not closely balanced.

¶ 44 In order to engage in plain-error review, we first must determine that an error occurred. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Rule 431(b) requires the trial court to ask potential jurors whether they *understand* and *accept* the four *Zehr* principles. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see also *Zehr*, 103 Ill. 2d 472. A specific question and response process is mandated. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). Here, the trial court asked the jurors whether they "agreed" and "accepted" the principles and whether they would apply them. This matter was adjudicated prior to our supreme court's decision in *People v. Sebby*, 2017 IL 119445. The same trial judge that erred in delivering the admonishments in *Sebby* essentially delivered the admonishments in the same colloquial manner in the instant case. See *id.* ¶¶ 7-8. While it may appear to be commonsense that anyone who agrees to and undertakes the responsibility to apply principles of law tacitly admits to understand said principles (see *People v. Blankenship*, 406 Ill. App. 3d 578, 582 (2010) ("Tacit here was the premise that a rational juror *** would not claim to accept the *Zehr* principles unless that juror believed he or she understood them.")), our supreme court precedent is clear, "the trial court's failure to

ask whether the jurors understood the principles constitutes error alone." *People v. Belknap*, 2014 IL 117094, ¶ 46 (citing *People v. Wilmington*, 2013 IL 112938, ¶ 32).

¶ 45    Having found error, we must determine whether it rises to the level of requiring reversal under plain-error review. The plain-error doctrine allows a reviewing court to consider an unpreserved error when either a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or a clear or obvious error occurred that is so serious that it impacted the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 46    When a defendant claims first-prong plain error, a court of review determines whether the defendant has shown that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice. *Sebby*, 2017 IL 119445, ¶ 51. The defendant must show that the quantum of evidence presented by the State against him rendered the evidence closely balanced. *Piatkowski*, 225 Ill. 2d at 566. In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *Belknap*, 2014 IL 117094, ¶¶ 52-53.

¶ 47    As described above, the evidence was not closely balanced with regard to the possession of a firearm by a felon charge. *Supra* ¶¶ 39-40. The State presented sufficient evidence for a jury to find beyond a reasonable doubt that defendant had constructive possession of the weapons. Defendant does not point us to anything that would tend to show that the evidence was closely balanced, aside from his testimony and that of his inebriated brother. In plain-error review, the burden of persuasion belongs to defendant. *Thompson*, 238 Ill. 2d at 613. Defendant has failed to carry this burden.

¶ 48    Turning to the sufficiency of the evidence concerning defendant's other convictions, he, again, points us to no reason why the evidence was closely balanced, warranting reversal. See *id.* (defendant carries the burden of persuasion in plain-error review). After reviewing the record, the evidence put forth by the State was sufficient to sustain defendant's convictions on all other charges. We find that the evidence was not so closely balanced as to require reversal under plain error due to the trial court's failure to ask if the jurors understood the *Zehr* principles.

¶ 49                    C. Illinois Supreme Court Rule 401(a)

¶ 50    Next, defendant argues that the trial court failed to properly admonish him pursuant to Rule 401(a) when he waived his right to counsel. See Ill. S. Ct. R. 401(a) (eff. July 1, 1984). Defendant recognizes his failure to properly preserve this argument on appeal by asserting a timely objection and raising the matter in his posttrial motion and asks for plain-error review. See *Enoch*, 122 Ill. 2d at 186. The State argues the trial court substantially complied with the rule and no error occurred.

¶ 51    The United States Constitution guarantees a defendant in a criminal proceeding "both the right to the assistance of counsel and the correlative right to proceed without counsel." *People v. Wright*, 2017 IL 119561, ¶ 39 (citing *Faretta v. California*, 422 U.S. 806, 832-34 (1975)); U.S. Const., amend. VI. Accordingly, the defendant may waive his constitutional right to counsel as long as the waiver is voluntary, knowing, and intelligent. *Wright*, 2017 IL 119561, ¶ 39.

¶ 52 Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) controls the trial court's acceptance of a defendant's waiver of counsel and provides:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences[.]"

¶ 53 Compliance with Rule 401(a) is required for an effective waiver of counsel, however, " 'substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights.' " *Wright*, 2017 IL 119561, ¶ 41 (quoting *People v. Haynes*, 174 Ill. 2d 204, 236 (1996)).

¶ 54 Defendant was admonished during his first court appearance that he faced extended-term sentencing. He was told he could receive up to 10 years on both counts I and II and 6 years on count IV. During his next court hearing, his counsel waived the reading of the additional charges and corresponding sentencing ranges. Defendant was given a copy of the charging instrument that described the additional charges. The trial court failed to admonish defendant as to the nature of the charges or the minimum or maximum sentence he faced before allowing him to waive counsel. The lack of any admonishments whatsoever until the hearing following defendant's waiver fails the test of substantial compliance. See *People v. Campbell*, 224 Ill. 2d 80, 84-85 (2006). Consequently, defendant could not give an effective waiver of his right to counsel. *Id.* It is incumbent on the trial court to comply with supreme court rules, and the utter failure to do so in this instance necessitates reversal of defendant's convictions and remand for a new trial on all charges except the possession of a stolen firearm by a felon charge he was previously acquitted on. See *id.* at 87; see also *People v. Glasper*, 234 Ill. 2d 173, 189 (2009) ("[T]he rules of this court are not mere suggestions.").

¶ 55 The State's reliance on *People v. Maxey*, 2018 IL App (1st) 130698-B—for the propositions that the trial court could rely on (1) defendant's knowledge of the information absent from the alleged admonishment and (2) defendant's legal sophistication—is misplaced. In that case, the court, albeit incorrectly, admonished defendant as to the minimum and maximum sentence he faced and the nature of the charges. *Id.* ¶ 48. That is in stark contrast to the situation we are confronted with here, where there was no compliance, substantial or otherwise. Accordingly, the trial court failed to comply with Rule 401(a) in any fashion.

¶ 56 Although this error alone requires reversal, we address defendant's constitutional argument because the cause will be remanded for a new trial allowing for the possible repetition of error.

¶ 57                    D. Closure of Courtroom During Jury Selection

¶ 58 Defendant argues that the closure of the courtroom during jury selection violated his constitutional right to a public trial. Defendant acknowledges that he has procedurally forfeited this argument but asks that we relax forfeiture rules or, in the alternative, conduct a plain-error

review focusing on the second prong. The State argues the closure was trivial and that there is no support in the record that anyone was actually excluded.

¶ 59     While defendant did not knowingly and voluntarily waive his right to a public trial, he has forfeited the issue on appeal by failing to make a timely objection and raising the issue in a posttrial motion. *Thompson*, 238 Ill. 2d at 611-12. Defendant argues that the rules of forfeiture should be relaxed in this case because any objection he would have made "would have fallen on deaf ears." (Internal quotation marks omitted.) *Id.* at 612 (citing *People v. Sprinkle*, 27 Ill. 2d 398 (1963)). But as we have previously held, "[t]he logic underlying *Sprinkle* must be weighed against the strong policy in favor of preserving errors for review." *People v. Cetwinski*, 2018 IL App (3d) 160174, ¶ 34. There is no evidence in the record that the trial court would have refused to make an accommodation if an objection was made. To the contrary, the record is replete with instances where the trial court accommodated defendant's requests. Defendant points this court to no explanation as to why an objection would have fallen on deaf ears, except for the allegation that it was standard practice for the trial court to close the courtroom during *voir dire*. Similar to *Cetwinski*, we decline to apply *Sprinkle* and refuse to excuse defendant's forfeiture.

¶ 60     Turning to plain error, the State requests we follow the same analysis this court promulgated in *Radford*, 2018 IL App (3d) 140404. Again, the authority cited by the State is factually inapposite. The trial court in *Radford* only partially closed the courtroom and made findings as to why it was doing so. *Id.* ¶¶ 4-5. The trial court here did not make any record as to why the courtroom was being closed except to explain that the room was needed for the venire. We refuse to apply the reasoning in *Radford* to these facts, where the trial court made no attempt to safeguard defendant's constitutional right to a public trial. See *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1909 (2017) (" [A] judge may deprive a defendant of his right to an open courtroom by making proper factual findings in support of the decision to do so."). We also find the State's argument that there is no record to support the allegation of a closure unpersuasive. The lack of support is attributable to the trial court's dereliction of duty to make factual findings as required before a closure is allowed. See *id.* at ___, 137 S. Ct. at 1909. The complete closure of the courtroom during *voir dire* without any findings constitutes reversible plain error. We, therefore, need not address defendant's sentencing arguments.

¶ 61     We issue this opinion in hope of reminding trial courts that courtroom closure is a serious constitutional issue not to be glossed over lightly. If a trial court finds full or even partial closure necessary, it should make a clear record as to the justification for the same.

¶ 62                           III. CONCLUSION

¶ 63     For the foregoing reasons, we reverse the judgment of the circuit court of La Salle County and remand for a new trial.

¶ 64     Reversed and remanded.

¶ 65     JUSTICE O'BRIEN, concurring in part and dissenting in part:

¶ 66     I dissent from the majority opinion because the evidence at trial was insufficient to prove the defendant guilty beyond a reasonable doubt of unlawful possession of a weapon by a felon.

¶ 67        To prove Andrew was guilty of unlawful possession of a weapon by a felon, the State had to show that he knowingly possessed a firearm and had previously been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2014); *People v. Vasquez*, 368 Ill. App. 3d 241, 249 (2006). A person may actually or constructively possess a firearm. *People v. Macias*, 299 Ill. App. 3d 480, 484 (1998). To establish constructive possession, the State must prove that the defendant (1) had knowledge the weapon was present and (2) had immediate and exclusive control over the area where the weapon was found. *People v. McIntyre*, 2011 IL App (2d) 100889, ¶ 16. Constructive possession is established where the defendant does not actually possess the weapon but has "an intent and a capability to maintain control and dominion" over the weapon. *Macias*, 299 Ill. App. 3d at 484. Exclusive control may include joint possession, that is, two or more people may have immediate and exclusive control. *People v. Tates*, 2016 IL App (1st) 140619, ¶ 25.

¶ 68        The defendant's status as the owner and driver of a vehicle where a weapon is found does not mean he possesses everything in the passenger area, particularly when there is a passenger who may possess the contraband. *McIntyre*, 2011 IL App (2d) 100889, ¶ 17 (citing *People v. Day*, 51 Ill. App. 3d 916, 918 (1977)). Generally, driving one's own vehicle with a weapon gives rise to the presumption the driver has knowledge of the weapon, but the presumption is rebuttable. *People v. Seibech*, 141 Ill. App. 3d 45, 49 (1986). Similarly, a defendant's presence in the car, without more, does not establish that he knew the weapon was in the vehicle. *People v. Bailey*, 333 Ill. App. 3d 888, 891 (2002). Factors to be considered by the court to determine whether the defendant's knowledge of the weapon can be inferred include (1) the weapon's visibility from the defendant's position, (2) the amount of time the defendant had to observe the weapon, (3) gestures by the defendant indicating an attempt to hide or retrieve the weapon, and (4) the weapon's size. *Id.* at 891-92. The defendant's ownership or possessory interest in the weapon or vehicle are additional factors for the court to consider. *Id.* at 892.

¶ 69        Andrew maintains that he had no knowledge of the shotguns in the car. Jeremiah admitted that the guns belonged to him and that he never told his brother he had the guns in the car. Andrew and Jeremiah's father testified that Jeremiah had one of the guns when he previously lived with his father. The guns were stolen from a Lewistown, Pennsylvania, address next door to where Jeremiah once lived. The jury acquitted Andrew of aggravated possession of stolen firearms, indicating that it believed that Jeremiah was responsible for obtaining the guns. Andrew admitted that he engaged in other misconduct, including fleeing from the police and his prior felony conviction for robbery. Andrew denied any knowledge that the guns were in the car and disagreed with his brother's decision to place the guns in the car. In fact, Jeremiah stated Andrew would not have allowed the guns if he had known they were present. The record establishes that Andrew was in conflict with Jeremiah over Jeremiah's excessive drinking and other objectionable conduct. In fact, Andrew was returning his brother to Pennsylvania, because of Jeremiah's bad behavior, when they were stopped by the police. Andrew's displeasure and disagreement with his brother's actions support his claim that he did not know the guns were in the car.

¶ 70        The majority surmises that the fact the guns were in the car while Andrew and Jeremiah traveled across the country in the car necessitates that Andrew was aware of the weapons. However, the car was filled with a variety of travel gear, such as suitcases and clothes, as well as Andrew's camping equipment, which could reasonably include some portable nylon chairs stored in bags similar to the ones in which the guns were found. Andrew indicated that he was

on his way to live in Alaska, necessitating that all Andrew's belongings and whatever items Jeremiah brought with him be loaded together. Because the car was filled with items, it was feasible that Andrew was not aware of the guns when Jeremiah loaded them in the car or during the trip. Andrew was not present when Jeremiah loaded his things into the car. The majority asserts that it was reasonable to infer that because the brothers were on a cross-country trip, they stayed in hotels or campgrounds and unloaded the vehicle each night, making it unlikely that Andrew would not have come across the guns. It is equally feasible that Andrew and Jeremiah had small overnight bags they kept accessible for when they stopped for the night. The majority also contends that because the vehicle lacked a trunk, the guns could not be concealed, and because the bags in which they were stored were open-ended, the bags would not have obscured the guns. I find the majority's suggestions to be speculation. By all accounts, the bags in which the guns were stored were similar to bags used for portable lawn chairs, which, although open-ended as the majority notes, also have some means such as a drawstring to secure the chairs within the bags. It is not a stretch to consider that Jeremiah pulled the drawstring tight to keep the guns within the bags and out of Andrew's sight.

¶ 71  The State did not present evidence that Andrew could see the guns from the driver's seat or that he observed them for any period of time. See *id.* (State did not establish defendant had knowledge of weapon where weapon was under seat and not visible to defendant passenger). The State did not prove where the guns had been located in the car. The majority speculates that the guns were readily retrievable because Jeremiah was able to reach them to throw the bags out the window during pursuit. That Jeremiah accessed them to throw them out the car window does not establish that Andrew had control over them. See *People v. Bogan*, 2017 IL App (3d) 150156, ¶¶ 31-36 (control of the vehicle trumps ownership of it in establishing knowledge). The pursuing officers lost sight of the vehicle during the time the guns were tossed. Jeremiah might have crawled into the backseat or reached under the seat or along the passenger-side floorboard to retrieve them. The majority also relies on Jeremiah's drunkenness and inability to remember the incident with the police as support that Jeremiah's claim of ownership was not believable. However, his drunken state at the time of the stop and chase and during the trip would not cause him to black out his ownership of the guns.

¶ 72  The State did not present any evidence that Andrew tried to hide or retrieve the shotguns. His flight from the traffic stop was not connected by the State to the guns. Andrew fled from the traffic stop only after a drug dog alerted to the vehicle. A small amount of cannabis and drug paraphernalia were discovered when the car was searched. There were also other items of contraband in the vehicle, such as the counterfeit bills, that could be connected to Andrew and may have been reason for his flight. In addition, he testified that he fled as the result of his panic disorder. Finally, although the shotguns were long guns, as discussed above, they were secreted in bags like those used to store camping equipment and would be of a similar size. The plausibility of Andrew's claims that he was unaware of the guns is bolstered by the fact that the police officer did not observe anything that appeared to be a weapon when he looked inside the vehicle during the initial traffic stop.

¶ 73  Although the majority dismisses it as factually distinguished, I agree with Andrew and consider *McIntyre*, 2011 IL App (2d) 100889, supportive of his position. In *McIntyre*, the defendant, like Andrew, was the driver of a car with a passenger who admittedly possessed the weapon found in the vehicle. *Id.* ¶ 2. The passenger removed the gun from the crotch of his pants, fired it several times, and then placed it under the front passenger seat. *Id.* ¶¶ 3, 5. The

reviewing court considered that although the defendant was aware of the weapon from the time the passenger retrieved it from his pants to when the car was stopped by the police, the State did not establish the defendant had immediate and exclusive control over it. *Id.* ¶ 16. The same conclusion applies here. Although the State maintains it would implausible for Andrew to have traveled with the guns in the car and not exercised control over them, as discussed above, the weapons were secreted in lawn chair bags that looked like camping gear. By all accounts, there was "a lot" of camping gear in the car. It would be common for Andrew and Jeremiah to have brought only overnight bags into hotel rooms they rented along their route, leaving the camping gear and lawn chair bags untouched in the car. Although it is undisputed that Jeremiah held one of the bags out the passenger window, *McIntyre* instructs that Jeremiah's ability to access the guns does not translate to Andrew's ability to exercise control over them. In my view, the State failed to prove that Andrew constructively possessed the shotguns found in his vehicle, and I would reverse his conviction for unlawful possession of a weapon by a felon.

¶ 74        Although I do not believe the evidence was sufficient to convict Andrew, and therefore would find it unnecessary to reach the other issue presented by the defendant in this appeal, I will address each in turn.

¶ 75        I disagree with the majority's premise that the trial court made no findings before closing the courtroom during the *voir dire*. The trial court indicated that Andrew's mother would need to leave the courtroom during *voir dire* in order to have enough room for the prospective jurors. The trial court stated that "[t]he jury needs the space." The majority acknowledges the trial court's statement but disregards it. While the majority found the trial court's finding sufficient in *People v. Radford*, 2018 IL App (3d) 140404, it has declined to do so in the instant case but fails to offer any reasonable basis for making the distinction. As here, the *Radford* court expressly noted the inability of the courtroom to accommodate the large number of potential jurors and spectators. *Id.* ¶ 50. In addition to space limitations, the court also recognized that the high emotions displayed by the spectators risked contaminating the jury pool. *Id.* Like Andrew, the defendant in *Radford* did not object to the courtroom closure. *Id.* ¶ 52. In fact, in *Radford*, this court made it clear that defense counsel's failure to offer a contemporaneous objection to a courtroom closure almost guarantees a "trial court would not likely cure a violation or formally express its findings on the record." *Id.* ¶ 58 (citing *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1909-10 (2017)). To that end, I would find the trial court here did make a finding with regard to the decision to close the courtroom.

¶ 76        The next step would then be to determine whether, in light of defendant's forfeiture, the trial court committed clear error. Following the analysis employed in *Radford*, I would find the partial closing of the courtroom in this matter did not deprive the defendant of his right to a public trial. Andrew does not present any indication that the temporary closure (1) resulted in an unfair trial, (2) permitted the State or trial court to concede their responsibilities to Andrew or allowed them to disregard the import of their functions, (3) affected any witnesses from coming forward, or (4) failed to prevent perjury. See *id.* ¶ 56. Of course, as discussed by the majority, a finding of fact, a consideration of alternatives and acknowledgement of the importance of a public trial would be the best way to determine whether the partial closure was warranted. A timely objection would certainly go a long way to ensuring this right was protected. Nevertheless, despite the court's failure to employ those steps, I would consider the closure here was trivial and did not deprive Andrew of his right to a public trial. See *id.* ("Not every courtroom closure results in an unfair trial, nor does each closure affect the values

- 14 -

underlying the sixth amendment's public trial guarantee." (citing *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1910)).

¶ 77     I concur in the remainder of the majority's decision.