NOTICE
Decision filed 01/30/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230413-U

NO. 5-23-0413

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-CF-20 |
| | ) | |
| FRED W. WILLIAMS, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices McHaney and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant failed to show plain error where the trial court's alleged closure of the courtroom was narrowly tailored to prevent witness intimidation. Further, the defendant fails in his argument that he was rendered ineffective assistance of counsel by way of cumulative error. Finally, the trial court did not abuse its discretion in sentencing the defendant to an aggregate sentence of 78 years where the sentence fell within the statutory sentencing range. Thus, we affirm the defendant's conviction and sentence for first degree murder.

¶ 2    On March 9, 2023, a Madison County jury found the defendant, Fred W. Williams, guilty of one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) and one count of reckless discharge of a firearm (*id.* § 24-1.5(a)), and that the defendant personally discharged a firearm that proximately caused death to another person (*id.* § 9-1(a)(2)). On May 11, 2023, the trial court denied the defendant's motion for a new trial and sentenced him to an aggregate sentence of 78 years. The defendant appeals his conviction and contends that his conviction should be reversed

1

and the matter remanded for a new trial because his sixth amendment right to a public trial was denied by the temporary closure of the court to the public during a witness's testimony. The defendant also argues that trial counsel committed several errors which, cumulatively, resulted in ineffective assistance of trial counsel. In the alternative, the defendant argues that his 78-year sentence is excessive in light of the mitigating evidence and requests that his sentence be vacated and the case remanded for a new sentencing hearing. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On July 21, 2021, the State charged the defendant for the murder of Delas Carter and with reckless discharge of a firearm.

¶ 5     Prior to trial, on February 21, 2023, a hearing was held on the defendant's motion to suppress identification of the defendant from a photograph line-up and to suppress a video recording of witness Messiah Bailey identifying the defendant from the photograph line-up. The court denied the motion.

¶ 6     The trial commenced on March 6, 2023, with *voir dire*. The jury pool consisted of 33 potential jurors, from which 12 jurors and 2 alternates were selected. Before jury selection on March 6 and 7, the trial court heard arguments regarding several motions *in limine*, including a motion to suppress Amanda Hall's testimony regarding cellphone records and a motion to suppress Dionta Moore's statements as hearsay. The court allowed the cellphone records to be admitted if, during the course of the trial, the State could properly establish the evidence and show relevancy. The court also held that Moore's statements could be allowed under the coconspirator hearsay exemption.

¶ 7     The trial took place over three days: March 7, 8, and 9. The State called 28 witnesses. We summarize below the relevant portions of the trial.

2

¶ 8    At trial, the evidence showed that, on June 25, 2021, the Granite City Police Department responded to a shooting at Cheapies Tires. One employee, Delas Carter, was fatally shot while another, Cody Wahle, was struck by a ricochet and suffered superficial wounds. At the scene, police recovered several bullet casings bearing the markings, "9 mm Luger." They also recovered video recordings of the shooting from Cheapies Tires' video surveillance system. The recordings showed the shooter emerge from the passenger side of a red Dodge Charger (Charger) wearing a black face covering, black shirt, black pants with three white stripes, and black shoes with three white stripes. The shooter approached Delas Carter and shot him several times with a silver handgun before retreating towards the Charger. The shooter then turned back around, stood over Carter, and shot him several more times. The shooter then ran to the Charger and fled the scene.

¶ 9    From the video, the police also determined that the Charger had driven past a license plate reader (LPR). They obtained the license plate number from the reader and set up an alert to be notified if another LPR detected the Charger. The police received the alert approximately 45 minutes later, and one officer attempted a traffic stop. The Charger fled and a high-speed chase ensued. An Illinois State Police trooper attempted to intercept the vehicle but was unsuccessful. Tamariah Hendricks was ejected from the vehicle during the chase and was detained. The chase continued towards McKinley Bridge, where another responding officer attempted to block the Charger. The Charger crashed into the police vehicle but was stopped when a semi-truck driver used his vehicle to block all lanes.

¶ 10    As police approached, Messiah Bailey and Hendricks's minor daughter exited the back seat of the Charger and ran to the police, screaming, "he shot himself, he shot himself." Police found Dionta Moore deceased in the driver's seat, having shot himself in the head with a Glock 27. Police determined the Glock 27 could not have fired the 9-millimeter casings found at Cheapies Tires.

3

The gun was seized, Moore's body removed, and the police conducted a visual search of the vehicle. Crime scene technician Robert Powell took photos of the scene, including the vehicle's interior and the "drum magazine" found in the Charger.

¶ 11    The Charger was towed to the Granite City Police Department's impound lot and stored in a secure building. The vehicle was processed after the police obtained a warrant. In the trunk of the Charger, police found a plastic bag containing two black shirts, a pair of black Adidas pants, and black Adidas tennis shoes. The clothes were sent to the state crime lab, which later tested DNA from the clothes against buccal swabs from the defendant and found them to be a match.

¶ 12    Tamariah Hendricks testified that she was the owner of a red Dodge Charger, and that on the day of the shooting, she was with Moore, her boyfriend at the time. She testified that Moore received a brief FaceTime call followed by a longer telephone call, after which he told her that he needed to go to Cheapies Tires. Defense counsel objected to the statement as hearsay, but the trial court allowed the testimony, finding, as in its prior ruling, that the statement qualified under the coconspirator exemption to the hearsay rule. Hendricks further testified that she, her daughter, and her friend, Bailey, went with Moore in the Charger to get a ride to a property she owned near Cheapies Tires. Moore first stopped near 1309 St. Louis Avenue before moving on and picking up an unknown man at a stop sign down the street. Hendricks authenticated two surveillance videos of the pickup that police had obtained from houses near 1309 St. Louis Avenue. Hendricks did not see the man's face, as she was sitting in the front, but she knew Bailey spoke with the man a little. Hendricks, her daughter, and Bailey were dropped off at Hendricks's property, and she believed the men continued to Cheapies Tires. The trial court overruled defense counsel's objection to this statement as speculation. Hendricks further testified to Moore returning at a later time, picking her up, and the ensuing high-speed chase. She did not know why there was a bag with two black shirts,

4

black Adidas pants, and black Adidas shoes in the trunk of her car. On redirect, Hendricks testified that she was scared and would not have testified if not for the subpoena. On recross, defense counsel asked if Hendricks was scared of the State. Hendricks answered, "No."

¶ 13   Detective Cody Beishir testified that Hendricks agreed to show him where Moore had taken her to pick up "his cousin" as seen in the video. Defense counsel objected to this statement but was overruled. No other allegations of a family connection between Moore and the defendant were made during the trial.

¶ 14   Evidence was presented that, on June 30, 2021, police conducted a search of 1309 St. Louis Avenue, pursuant to a warrant. The home belonged to Breneisha Williams, the defendant's cousin. During the search, police seized a multi-camera surveillance system. Several video clips from the surveillance system were entered into evidence. The clips show the defendant entering the home in the days prior to the murder. They also show what appears to be the defendant wearing a black shirt, black pants with three white stripes, and black shoes with three white stripes pacing in the living room of the home less than an hour before the murder. Police also noted that the system stopped recording at approximately 11:45 a.m. and resumed recording at approximately 2 p.m. on the day of the murder. Further surveillance clips from nearby residences showed a man wearing dark clothing at around 11:01 a.m. walking towards the intersection where Hendricks testified that Moore had picked up the passenger.

¶ 15   During the search of the home, the police also seized several items presumably belonging to the defendant. Included in the items were a gun magazine containing several 9-millimeter cartridges and a St. Clair County notice for a court appearance for "Fred W. Williams, Jr." to appear at a hearing involving charges of aggravated battery in a public place. Photographs of the items were admitted into evidence during the trial, without objection from defense counsel.

5

Breneisha Williams (Breneisha) returned home during the execution of the warrant. Breneisha declined to be interviewed and was ultimately arrested for obstruction of justice and her iPhone was seized.

¶ 16    Breneisha was subpoenaed by the State and was granted use immunity for her testimony. During direct examination, Breneisha answered multiple yes or no questions with "I don't know," including questions regarding whether she recognized the man in the videos from her home and whether she wanted to testify against her cousin. Breneisha was cautioned by the trial court that, pursuant to her immunity agreement, she could be held in contempt should she continue to refuse to answer the State's questions.

¶ 17    Shortly thereafter, the trial judge called a recess and temporarily sent the witness and jurors from the courtroom. The trial judge then made the following observation:

> "THE COURT: While this witness has been testifying I have seen gestures, head gestures and hand gestures from people sitting in the courtroom. I am removing everyone in this courtroom, except for court personnel for the duration of this witness's testimony. When she is done testifying, everybody can come back in. But I am not going to allow this witness to be intimidated while she is testifying. So at this point everyone in the courtroom, except for courtroom personnel, are to leave the courtroom. Thank you."

The defendant, the witness Breneisha, the jurors, alternate jurors, the attorneys, and court personnel remained in the courtroom for the remainder of Breneisha's testimony. The judge also stated that Breneisha's personal attorney was to stay in the courtroom as well. Defense counsel did not object.

¶ 18    Upon resuming testimony, Breneisha continued to deny recognizing the man in the security footage from her home but did testify that she could see white markings on his shoes. On cross-examination, defense counsel asked Breneisha if she would have appeared had she not been subpoenaed, and if she feared for her safety, and she confirmed that both were true. On redirect,

the State asked if Breneisha was afraid she would be harmed for testifying. Breneisha answered, possibly, if her testimony was misinterpreted. On recross, Breneisha testified she was not afraid of the defendant. Following the completion of Breneisha's testimony, the trial court stated:

> "THE COURT: Because I had cleared the courtroom, before you called your next witness I wanted to give those people the opportunity to come back into the courtroom ***. *** Those people can be let back into the courtroom."

¶ 19    Amanda Hall testified that she was a branch manager for Enterprise Rent-A-Car in downtown St. Louis. Upon police request, Hall checked a phone number in Enterprise's system and found a reservation for June 25, 2021, with all identifying information matching the defendant. Hall testified that she did not take the reservation herself and that it was possible that someone else could have made the reservation under the defendant's name. Defense counsel did not renew the earlier pretrial objections made with regard to this evidence.

¶ 20    The defendant had been arrested in Belleville, Illinois, on July 20, 2021. Two cellphones, one an iPhone 7 Plus, were seized during the arrest. Police extracted and compared data from the cellphones seized from the defendant, and from those of Breneisha and Moore. The data indicated that the iPhone 7 Plus's number matched both the number used for the Enterprise Rent-A-Car reservation and the number saved in Moore's cellphone as "Luh Fred." The extracted data showed "Luh Fred" called Moore on FaceTime and voice call on the morning of the murder. The data also showed that a user attempted to delete the record of the calls to Moore. GPS data from the iPhone 7 Plus also showed that the phone was near the crime scene on the day of the murder at 11:22 a.m.

¶ 21    Sergeant Donahey testified about the investigation following the retrieval of the phone records. Sergeant Donahey testified that the iPhone 7 Plus was in airplane mode multiple times following the shooting, essentially dead to the network, but that the phone was turned on and was located at the Detroit airport, the St. Louis airport, and finally in Belleville, where the defendant

7

was arrested. He also testified that on July 16, 2021, the phone was used to conduct a Facebook search for "Tanyetta Windom," Delas Carter's girlfriend who was a witness to the murder.

¶ 22    Sergeant Donahey further testified that the defendant was not at first the only suspect. One suspect, Windom's ex-boyfriend, was at work and had an alibi. Another person investigated resided at 1307 St. Louis Avenue, right next to 1309 St. Louis Avenue, but was discounted when police determined the suspect observed in the various recordings had entered 1309 St. Louis Avenue, not 1307.

¶ 23    When asked about any eyewitness identification of the defendant, Sergeant Donahey testified that there was an eyewitness. Defense counsel objected when Sergeant Donahey was asked to identify the witness. At a sidebar, the witness was identified as Messiah Bailey, but it was noted that she was unavailable. The State's counsel indicated that Bailey had not been subpoenaed as she had moved to California, the State had only recently managed to find her, and she had agreed to testify but had not taken the flight the State had arranged for her. The trial court sustained the objection and would not allow the State's photograph line-up evidence to be admitted. However, the trial court allowed Sergeant Donahey to testify to the fact that the police had spoken to Bailey to show that the police had conducted a thorough investigation.

¶ 24    Sergeant Donahey then testified that he had interviewed Bailey and identified her as the woman in the back seat of the Charger when "they picked up [the defendant]." Sergeant Donahey then testified that the defendant continued as his primary suspect after the interview. Sergeant Donahey testified that there had been a fourth suspect, but as he was not involved in that investigation, he could not say why that suspect had been eliminated.

¶ 25    The State's final witness, the State's investigator, Lee Brosseau, testified to the State's attempts to serve Windom and Bailey with subpoenas and the subsequent attempt to locate Bailey and bring her to the trial. The defendant did not present any witnesses in his defense.

¶ 26    After deliberating for approximately three hours, the jury returned with guilty verdicts for first degree murder and reckless discharge of a firearm.

¶ 27    At the sentencing hearing on May 11, 2023, defense counsel argued that the defendant had not been tried by a "representative cross section of [the] community." The State argued that such issues had to be raised during the jury selection process and that the defendant did not argue that the racial composition of the jury pool was the result of a biased selection process. The trial court affirmed the verdict and proceeded to sentencing.

¶ 28    Defense counsel argued that the mitigating evidence showed that the defendant should only receive the minimum sentence of an aggregate 46 years. The trial court stated that it had considered all the evidence and that it found the evidence against the defendant to be "overwhelming." The defendant was sentenced to 40 years for first degree murder, 35 years for personally discharging a firearm causing death, and 3 years for reckless discharge of a firearm, to run consecutively for a total sentence of 78 years.

¶ 29    The defendant did not file a motion to reconsider his sentence before initiating this appeal.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, the defendant argues that the trial court violated his sixth amendment right to a public trial by temporarily closing the courtroom to the public during Breneisha's testimony. The defendant also argues that he received ineffective assistance of trial counsel due to the cumulative effect of multiple errors made over the course of the trial, and that, if not for the total effect of those errors, the outcome of the trial would have been different. In the alternative, the defendant

9

argues that his 78-year sentence is an "unsurvivable life sentence" and excessive given the mitigating evidence.

¶ 32    The State argues that the defendant has forfeited his claim regarding the alleged court closure as trial counsel did not object during trial and is raising the claim for the first time on appeal. The State argues, in the alternative, that the court action was temporary and restricted and, as such, did not undermine faith in the fairness of the trial. The State also argues that defense counsel's errors were either not errors at all or were the result of trial strategy, and, even cumulatively, do not rise to the level of ineffective assistance of counsel as the defendant cannot prove prejudice. Finally, the State argues that the trial court properly considered the mitigating evidence and sentencing guidelines during the sentencing hearing and that the 78-year sentence was within the appropriate range for the charges.

¶ 33                                    A. Cleared Courtroom

¶ 34    What may appear as a fine point may yet be a critical point. We note that while issues presented are here framed as a claim of denial of the right to a public trial by a complete "closure of court," this could be a misapprehension of the trial court's actions. The trial court's directive was that "everyone in the courtroom *** [was] to leave the courtroom." When the witness testimony was over, the trial court ordered that "[t]hose people can be let back into the courtroom." Thus, the record does not show that the trial court specifically barred anyone else from entering or ordered the proceedings closed. While the record may allow the defendant's speculation as to the extremes of possible improper circumstances, the record before us likewise lends itself to a more inoffensive, and more probable, assessment of the courtroom circumstances. Given the record before us, which may legitimately be interpreted to show only that disruptive spectators were temporarily removed from the courtroom, we find no error. Nevertheless, as the defendant

10

characterizes the trial court's actions as a complete closure of the courtroom, we will also undertake to address the defendant's contentions.

¶ 35    The defendant argues that his constitutional right to a public trial was violated when the trial court temporarily cleared the courtroom during Breneisha's testimony. The defendant argues that since the denial of a right to public trial constitutes structural error, he should be granted a new trial. The defendant, however, admits that he has forfeited this issue by failing to raise it with the trial court, but asks this court to review the issue under the plain-error doctrine.

¶ 36    A claim may be raised for the first time on appeal if it is plain error. *People v. Galarza*, 2023 IL 127678, ¶ 45. The plain-error doctrine is a narrow and limited exception to the general rule of forfeiture applicable to unpreserved claims. The defendant must demonstrate a clear or obvious error occurred to prevail under the plain-error doctrine. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A reviewing court will review an unpreserved error when a clear or obvious error occurs and: (1) the evidence at the trial was closely balanced, or (2) the alleged error was so serious as to deny the defendant a fair trial. *Galarza*, 2023 IL 127678, ¶ 45. If such a showing is made under the second prong, the plain-error test requires reversal "regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* However, as stated in *People v. Evans*, "[a]n error will be designated structural only if it renders the trial fundamentally unfair or an unreliable means of determining guilt or innocence." 2016 IL App (1st) 142190, ¶ 8. The determination is "a fact-specific inquiry and we review the totality of the circumstances." *Id.* ¶ 9. The first step in plain-error review is to determine whether there was clear or obvious error. *People v. Schoonover*, 2021 IL 124832, ¶ 30.

¶ 37    A defendant's right to a public trial is guaranteed by the sixth amendment, applicable to the states through the fourteenth amendment. U.S. Const., amends. VI, XIV; *Gannett Co. v.*

11

*DePasquale*, 443 U.S. 368, 379-80 (1979). While a criminal trial is presumed open, the right is not absolute. *Waller v. Georgia*, 467 U.S. 39, 44 (1984). To determine if a court closure is permissible, we apply the four-part test established in *Waller. Id.* at 46. "To justify closing a trial proceeding, we examine: (i) whether there exists an ' "overriding interest that is likely to be prejudiced," ' (ii) whether the closure is no broader than necessary to protect that interest, (iii) whether the trial court considered ' "reasonable alternatives" ' to closing the proceeding, and (iv) whether the trial court made adequate findings to support the closure." *Evans*, 2016 IL App (1st) 142190, ¶ 10. Whether an individual's constitutional rights have been violated is subject to *de novo* review. *Schoonover*, 2021 IL 124832, ¶ 19. However, the standard for determining whether the record is sufficient to support a closing of the courtroom to spectators is whether there has been an abuse of discretion. *People v. Cooper*, 365 Ill. App. 3d 278, 282 (2006). A trial court abuses its discretion only where its rulings are "arbitrary, fanciful, or unreasonable" or where "no reasonable person would take the view adopted by the trial court." *People v. Ramsey*, 239 Ill. 2d 342, 429 (2010).

¶ 38    The defendant relies on *Evans* in support of his argument that the trial court's actions constitute second prong plain error. In *Evans*, 2016 IL App (1st) 142190, ¶ 7, the trial court barred the defendant's step-grandmother from the courtroom for the entirety of *voir dire*. The First District appellate court found that, while preventing juror contamination was an overriding interest, the mere presence of the defendant's family was unlikely to taint the juror pool and the limited space in the courtroom was not a viable reason for barring family from *voir dire*. *Id.* ¶¶ 11-12. Further, barring family from the courtroom for the entirety of *voir dire* was both broader than necessary to address those concerns, and more reasonable alternatives existed. *Id.* ¶¶ 13-15.

¶ 39    Looking at the totality of the circumstances in this case, we conclude that the defendant's right to a public trial was not violated by the trial court's actions during a portion of Breneisha's testimony. The record shows that, in the middle of Breneisha's testimony, the trial court took a break, excused the jurors from the courtroom, and removed Breneisha from the courtroom. Once the jurors and Breneisha had exited the courtroom, the trial court noted that it had observed, during Breneisha's testimony, "gestures, head gestures and hand gestures from people sitting in the courtroom." The trial court noted that it was removing "everyone" in the courtroom, except for court personnel, for the remainder of Breneisha's testimony. However, the trial court specifically noted that once Breneisha was finished testifying, all observers could return to the courtroom. The trial court then explained that it was "not going to allow this witness to be intimidated while she is testifying." The trial court also clarified that Breneisha's attorney was allowed to remain in the courtroom during Breneisha's testimony. The jurors and alternate jurors returned to the courtroom and the remainder of Breneisha's testimony was completed.

¶ 40    Applying the first *Waller* factor to these facts, we find that there was an overriding interest that was likely to be prejudiced, *i.e.*, preventing witness intimidation during the witness's testimony and protecting the integrity of court proceedings. The defendant seems to acknowledge this interest when he states, in his appellate brief, that the trial court might have an overriding interest in preventing a witness from being intimidated while testifying. Unlike in *Evans*, the threatening gestures and witness intimidation in this case were not just possibilities but rather observed facts specifically commented on by the trial judge during Breneisha's testimony. In addition, prior to Breneisha's testimony, a witness had admitted to being scared to testify and was only appearing under subpoena; another witness failed to appear despite being subpoenaed; and Breneisha herself testified that she was afraid of the consequences of her testimony being

13

"misinterpreted." We note from the record that Breneisha was under subpoena, had been given immunity for her testimony, and was not forthcoming in her testimony, as evidenced by her giving minimal responses. Further, unlike in *Evans*, the potential threat to an interest which the trial court must protect was not discussed in the more controlled circumstances of a pretrial motion or argument of the parties but rather arose unexpectedly during trial from court attendees. Thus, we conclude that there was an overriding interest that warranted the trial court's actions.

¶ 41    The second *Waller* factor is that closure must be no broader than necessary to protect that interest. We note that although the trial court removed the spectators from the courtroom upon observing witness intimidation, they were not removed for the remainder of the entire trial. Instead, the trial court merely cleared the spectators from the courtroom for the remainder of Breneisha's testimony. Thus, unlike in *Evans* where the spectators were removed for the entirety of the jury selection process, here, the spectators were removed during a small portion of a three-day trial that included 28 total witnesses. Once Breneisha's testimony was complete, all in attendance could reenter. The testimony during the spectators' exclusion amounts to approximately 12 pages out of several hundred pages of trial proceeding transcripts. No suggestion has been made that any misconduct occurred during the testimony. The questioning of the witness is fully reflected in the court records. Remarks on the record make clear that the trial court had observed threatening behavior or attempts at intimidation directed at the witness. The *sua sponte* actions by the trial court in response to urgent circumstances were apparently considered necessary to protect the witness and the integrity of the court proceedings.

¶ 42    Even though the exclusion from the courtroom was limited in duration, the defendant contends that the trial court's decision to remove everyone from the courtroom was overbroad. Specifically, the defendant contends that the trial court did not just remove the spectators who

14

were engaging in intimidating behavior, but also, possibly, other unidentified individuals. However, we have only speculation as to who was in attendance. It could also be concluded that none but the offending parties were present. The record is silent on number or identity of the spectators. No objections were made by the trial attorneys or other individuals. Thus, although the trial court excluded individuals from the courtroom, we find that the trial court's decision regarding Breneisha's remaining testimony was, in effect, narrow enough to guard against witness intimidation while still allowing the defendant a fair trial.

¶ 43   Regarding the third factor, the defendant contends that there was nothing in the record to indicate that the trial court considered reasonable alternatives to closing the courtroom. However, it is reasonable to conclude from the trial court's sudden interruption of Breneisha's testimony that the trial court instantly determined that there were no reasonable alternatives to removing the spectators which could have protected the interest being prejudiced at that time and allowed Breneisha to finish testifying without further intimidation. Due to a lack of objection by any party, resulting in no further description of the court's observations or explanation of circumstances, the record gives way to conjecture. Defense counsel may have viewed, correctly or incorrectly, the clearing of the courtroom as appropriate, or even to the defendant's benefit in some respect, but this still may have inadvertently given us an underdeveloped record. Without a contemporaneous objection, the trial court would not likely cure a violation or formally express its findings on the record. *People v. Radford*, 2020 IL 123975, ¶ 37. The trial court is presumed to know the law. *Schoonover*, 2021 IL 124832, ¶ 40. Notwithstanding a lack of a more complete explanation, the trial court, by its actions, could be seen as having determined that removing the spectators was the correct, and possibly the only, option.

15

¶ 44 Regarding the last factor, an overriding interest must be sufficiently supported by specific facts so that the reviewing court may determine the propriety of the trial court's action. *People v. Holveck*, 141 Ill. 2d 84, 100 (1990). However, a formal declaration of the reasons for closure is not required where the record shows sufficient reasons for the closure. See *id.* Here, the trial court noted that it had observed head and hand gestures from individuals sitting in the courtroom and that it was not going to allow Breneisha to be intimidated during her testimony. Also, as stated above, the trial record itself well reflects that the witness had acknowledged that she was not present voluntarily, and had appeared because of a subpoena. The witness had earlier declined to testify and had been thereafter granted immunity for her testimony. She had been cautioned by the trial court that her truthful testimony was a condition for her immunity agreement. The trial court, being aware of this, needed to act promptly and decisively in ending what the trial court viewed as intimidation of a witness on the stand during the witness's testimony. Thus, unlike in *Evans*, the trial court here made a record that it had observed witness intimidation and that it was acting to prevent further intimidation of the witness. The defendant contends that the trial court's comments here were not sufficient to support its actions because the trial court did not identify who among the spectators made the intimidating gestures. However, we find that the trial court's comments explaining its decision, and the trial record before us, are sufficient for us to determine whether the trial court's directive was properly entered.

¶ 45 Given the potential harm to the witnesses, the observed threatening gestures, and the witness's knowledge that there were hostile parties in the courtroom, clearing the court of all but necessary parties, court personnel, and the witness's attorney for the remainder of her testimony ensured the witness's safety and protected the integrity of both her testimony and that of the trial itself. We further note that our supreme court, in the above cited *Radford* decision, 2020 IL 123975,

16

¶ 37, suggests disfavor for reversals where the defendant offers no contemporaneous objection to a courtroom closure. As in *Radford*, we would offer that the actions of the trial court neither deprived the defendant of a fair trial nor undermined the integrity of the judicial process. *Id.* ¶ 42. The trial court's actions implicated none of the values underlying the defendant's right to a public trial. *Id.* Thus, we find that the defendant's right to a public trial was not violated by the trial court's decision to remove the courtroom spectators for a limited duration so that the witness could complete her testimony. Since we conclude that, under the specific facts of this case, the trial court did not err in its order concerning a portion of a single witness's testimony, we conclude that the plain-error exception does not apply. However, even if error were present, we do not find here that it would constitute second prong plain error requiring reversal. We determine that the defendant's trial was not rendered fundamentally unfair. As plain error is not established, we affirm.

¶ 46                          B. Ineffective Assistance of Counsel

¶ 47    The defendant further argues that he received ineffective assistance of counsel during his trial. While the defendant has admitted that there are no errors individually sufficient to find ineffective assistance of counsel, the defendant argues that the cumulative effect of defense counsel's errors during the trial was "devastating" and rendered the outcome of the proceedings unreliable. The State argues that there were no errors and that trial counsel's actions were reasonable trial strategy.

¶ 48    To establish that counsel was ineffective, a defendant must show that (1) his attorney's performance was objectively unreasonable and (2) the defendant suffered prejudice as a result. *People v. Manning*, 227 Ill. 2d 403, 412 (2008); see *Strickland v. Washington*, 466 U.S. 668, 690-92 (1984). Counsel's performance is measured by an objective standard of competence under prevailing professional norms. *Evans*, 2016 IL App (1st) 142190, ¶ 93. The effectiveness of

17

counsel must be assessed against an "objective standard of reasonableness from the perspective of the time of the alleged error and without hindsight." *People v. Reed*, 2014 IL App (1st) 122610, ¶ 66. As for the prejudice prong of the *Strickland* test, a defendant must show that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v. Houston*, 226 Ill. 2d 135, 144 (2007).

¶ 49    "In unusual cases, the cumulative effect of numerous errors can create a pervasive pattern of unfair prejudice despite the fact that none of the errors, standing alone, would be serious enough to warrant consideration under the second prong" of the *Strickland* test. (Internal quotation marks omitted.) *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 43; see also *People v. Lewis*, 240 Ill. App. 3d 463, 466 (1992). In this situation, the reviewing court must determine whether the defendant's substantial rights have been affected to such a degree that the court cannot state with confidence that the defendant's trial was fundamentally fair. *Johnson*, 2023 IL App (5th) 190426-B, ¶ 43. If the reviewing court cannot state with confidence that the defendant's trial was fundamentally fair, then reversal is warranted, even if the evidence of the defendant's guilt is overwhelming. *Id.*

¶ 50    It has been said that effective assistance of counsel is expected to be competent, not perfect. *People v. Rodriguez*, 364 Ill. App. 3d 304, 312 (2006). An attorney will not be found incompetent for declining to raise a meritless issue, and no prejudice is caused to defendant thereby. *People v. Edwards*, 195 Ill. 2d 142, 165 (2001). There is a strong presumption that defense counsel's actions fall under the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The standard of review for determining a defendant's ineffective assistance claim is *de novo*. *People v. Lewis*, 2022 IL 126705, ¶ 48.

¶ 51    In *Lewis*, 240 Ill. App. 3d at 466, defense counsel's cumulative errors were each individually unreasonable from an objective standard. Defense counsel "(1) failed to ask the court to instruct the jury on accomplice witness testimony; (2) based his defense on an exculpatory pretrial statement by defendant that was not introduced at trial; (3) failed to move for a severance; and (4) pursued a defense theory which left the jury with no choice but to convict defendant." *Id.* at 466-67. The court found each error to fall below objective standards of reasonable assistance of counsel. *Id.* While the prejudicial effect of each individual error was not enough to meet the second prong of *Strickland* on its own, the court found that the cumulative effect of the errors showed that the trial counsel's performance was deficient and that the defendant was prejudiced by defense counsel's deficient performance. *Id.* at 467.

¶ 52    Unlike in *Lewis*, the defendant here fails to show that the alleged errors are objectively unreasonable. The defendant identifies instances of trial counsel's actions or failures to act which fall under four broad categories: (1) failure to object, (2) failure to request limiting instructions, (3) introducing prejudicial evidence, and (4) failure to preserve objections. Of these categories, no single act, or failure to act, is found objectively deficient when viewed on its own.

¶ 53    Of the first category, the defendant alleges that counsel was ineffective for failing to object to the following: the racial composition of the jury pool, the admission of photographs of Moore's drum magazine and the "bloody aftermath" of his suicide, Detective Beishir's testimony that Moore went to East St. Louis to pick up his "cousin," the admission of the court document haling the defendant to court for an unrelated crime, the State's examination of Breneisha, the alleged courtroom closure, the admission of a photograph of the victim holding his daughter, Sergeant Donahey's testimony that Windom was the victim's girlfriend and at the scene of the murder, and

19

Sergeant Donahey's testimony regarding Messiah Bailey. The defendant also alleges that trial counsel failed to renew the objection to Amanda Hall's testimony.

¶ 54    Regarding the composition of the jury pool, under *Bradley*, trial counsel must show that the composition of the jury pool resulted from a systematic exclusion of specific racial groups. *People v. Bradley*, 348 Ill. App. 3d 677, 681 (2004). A single jury panel's composition can under or over represent certain groups through "random luck." *Id.* The record contains no indication of the racial makeup of the jury pool, or the jurors during *voir dire*. The record here fails to show that the composition of the jury pool resulted from the systemic exclusion of certain racial groups. As such, trial counsel's failure to object to the jury pool's composition during *voir dire* was not deficient representation. When this issue was raised posttrial, the trial court addressed the matter with a thorough analysis of what was required to succeed in such a challenge. Even if filed pretrial, the evidentiary hurdles to obtain a successful result in this motion are substantial and, as summarized by the trial court for this case, the motion is likely to fail. The trial court, by its explication, substantially summarized why the defense attorney here could not be seen as ineffective, and we agree with the trial court's conclusion.

¶ 55    Regarding the photographs of the interior of the Charger that were admitted into evidence showing blood splatter and a gun with an ammunition magazine, these photographs were properly admitted because they were used to show chain of custody for later forensic analysis of firearms to eliminate the driver, Moore, as the shooter. As for Detective Beishir's testimony that Moore went to pick up his "cousin," the statement was probably based on hearsay from another witness. Defendant was not later identified as the "cousin." Thus, defense counsel was not deficient in performance for failing to object to the photographs or this testimony.

20

¶ 56    Photographs of items found in the defendant's alleged residence, which included a court document issued to the defendant for an appearance in regard to an unrelated matter, were admitted to establish that the defendant had been at that residence. The document showed the defendant's name but also referred to a battery charge. However, it was not offered as evidence of other crimes.

¶ 57    As for the State's questioning of Breneisha, the defendant argues this questioning was improper and subject to objection. However, as noted above, the witness was under subpoena, had testified only with a grant of immunity, and was generally unresponsive. The trial court had previously admonished her concerning the obligation to tell the truth. The State had further been granted permission to treat her as a "hostile witness."

¶ 58    A photograph of the deceased victim holding his child was introduced during the trial and showed to the jury. The admission of a photograph depicting the victim prior to death is within the discretion of the trial court and will not be overturned absent an abuse of discretion. *People v. Scott*, 148 Ill. 2d 479, 547 (1992) (citing *People v. Lefler*, 38 Ill. 2d 216, 221 (1967)). We find that defense counsel's decision not to object falls under trial strategy, as an objection would likely fail and may have brought greater attention to the photograph.

¶ 59    A rental car company representative testified concerning a phone number used in connection with a reservation made in the defendant's name. We note that defense counsel had previously raised a hearsay objection relating to this testimony in an *in limine* motion. At trial, the testimony was properly allowed as a refreshed recollection.

¶ 60    Concerning Sergeant Donahey's testimony that Windom was the victim's girlfriend and was "on the scene" of the murder, the defendant contends that such testimony was hearsay. However, the record reflects that the detective may have had a basis other than hearsay for his knowledge of Windom's location. The statement of Windom being the victim's girlfriend was not

hearsay offered for the specific truth of the matter. Regardless, the admission of the testimony was harmless error.

¶ 61 Evidence was presented in regard to the State's attempt to obtain Bailey's testimony. The trial court allowed evidence explaining Bailey's absence as a testifying witness to rebut an inference that, because she was an uncalled witness, her testimony would have been adverse to the State. We do not find that this required defense counsel's objection or that it would have succeeded. Further, the defendant contends that testimony by Sergeant Donahey concerning his interview with Bailey improperly led to the conclusion that Bailey had identified the defendant as the shooter. The defendant contends that Sergeant Donahey testified that, after interviewing Bailey, Sergeant Donahey focused on the defendant as his "primary suspect." We do not find that characterization in the record. We find in the record the following exchange between the State and Sergeant Donahey:

> "Q. Now, what action, if any, did law enforcement take after interviewing Messiah Bailey?
> A. After interviewing Messiah Bailey, I continued the evidence as Fred Williams as the primary suspect."

¶ 62 However, we note that the record shows that Bailey had previously identified the defendant in a photograph identification line-up. Prior to trial, defense counsel filed a motion to bar the identification, and the trial court denied the motion. However, at trial, when defense counsel objected to expected testimony related to this matter, the trial court was informed that Bailey would not be testifying. After listening to argument by counsel, the trial court revised its ruling to only permit the very restricted questioning as found in the record cited above. Defense counsel advancing no further objection was not deficient in representation.

¶ 63 In regard to the summarized multiple issues listed above, we do not find that defense counsel performed unreasonably or incompetently in not making additional objections. Further,

22

we do not find that there is a reasonable probability that the outcome of the trial would have been different had he done so.

¶ 64    Of the second category, the defendant alleges that trial counsel failed to request limiting instructions. The defendant alleges that Detective Beishir's testimony that Hendricks agreed to show police where Moore picked up his "cousin" should have received limiting instructions in that the testimony was only admitted to explain what police did in the course of the investigation as a consequence of the statement. The defendant also alleges that Sergeant Donahey's testimony regarding Sergeant Donahey's subsequent conduct after speaking with Bailey should have been subject to limiting instructions in that the testimony was only admitted to show a thorough investigation.

¶ 65    Having thoroughly reviewed the record, we find that additional limiting instructions were unnecessary. Detective Beishir's statement was that Hendricks said she would show the detective where Moore picked up the defendant on the day of the shooting. Detective Beishir's testimony was objected to by defense counsel as hearsay. The objection was overruled, and the testimony was admitted specifically to show subsequent conduct of the investigators. Thereafter, Hendricks did in fact show the detectives the location. The second matter in question is the testimony in regard to police efforts to find witness Bailey, which was offered to rebut defense's argument that the police did not adequately investigate other suspects after interviewing Bailey. Sergeant Donahey indicated that he "continued the evidence as Fred Williams as the primary suspect." The defendant asserts that this testimony created an improper inference that Bailey had identified the defendant. However, the defendant does not suggest any specific limiting instruction or explain how such an instruction may have addressed any alleged error or harm. Therefore, we find that defense counsel was not objectively unreasonable for failing to request further limiting

23

instructions. Additionally, the jury was properly given the usual instruction at the close of trial that evidence received for limited purposes was not to be considered for any further purposes. Moreover, even if this court were to find that defense counsel's performance was deficient in not requesting additional limiting instructions in the two instances above, we would not find that the defendant was prejudiced to the extent that he was denied a fair trial or that, had such limiting instructions been given, a reasonable probability exists that the result of the trial would have been different.

¶ 66    As to the third category, the defendant alleges that defense counsel introduced evidence prejudicial to the defendant. We do not find that the record is in accord with the defendant's allegations. In fact, the record may support the opposite conclusion. Hendricks was questioned by the State on her reluctance to testify without a subpoena. Hendricks indicated that without a subpoena she would not have appeared. Defense counsel asked if she was scared of the State, to which she answered, "No." As to Breneisha Williams, she was under a subpoena and given use immunity to testify. During her testimony, she was generally evasive and gave minimal responses. In reply to defense counsel, Breneisha indicated she had a mistrust of police. When asked by the State whether she feared testifying against the defendant, Breneisha said, "No." When asked by defense counsel if she was fearful of the defendant, Breneisha said, "No." We do not view defense counsel's conduct as unreasonable, and no harm to the defendant is apparent.

¶ 67    Of the fourth category, the defendant alleges that trial counsel erred by failing to preserve four matters objected to at trial: Hendricks's testimony regarding Moore's statements the day of the murder, Hendricks's speculation that Moore and the unknown man went to Cheapies Tires after dropping her off, Detective Beishir's testimony that Hendricks told him where Moore picked up the unknown man, and Sergeant Donahey's testimony that the defendant continued to be

24

Sergeant Donahey's primary suspect after speaking with Messiah Bailey. The hearsay objections to Hendricks's testimony were overruled as coconspirator statements and admissible as showing subsequent conduct, respectively. The objection to Detective Beishir's testimony, as examined in more detail above, was overruled and admitted for showing subsequent investigation conduct. The objection to Sergeant Donahey's testimony was overruled to show that the police conducted a thorough investigation and their subsequent actions. In such circumstances, as discussed above, it is not unreasonable for defense counsel to elect not to pursue an objection that counsel has reason to believe will not succeed. A defense attorney is not required to raise every objection from trial in a posttrial motion. *People v. Schnurr*, 206 Ill. App. 3d 522, 527 (1990). Decisions as to which issues to include in a posttrial motion are also to be viewed within the considerations of trial strategy. *Id.* Further, prejudice to the defendant must be established to demonstrate that, had those issues been included in a posttrial motion, appropriate relief would have been granted. We do not find deficient performance in this matter and, even if it were found, we do not find that harm or prejudice to the defendant has been established.

¶ 68    Finally, as stated above, it is not this court's role to critique all points of defense counsel's trial strategy. Having thoroughly reviewed the record, we find that the defendant has failed to overcome the presumption that the remainder of trial counsel's alleged errors was reasonable trial strategy. Further, given the evidence against the defendant, the defendant failed to show that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. Thus, we find that the defendant did not receive ineffective assistance of counsel.

¶ 69                              C. Excessive Sentencing

¶ 70    On appeal, the defendant argues that the 78-year sentence was an "unsurvivable life sentence" and excessive in light of the "overwhelming" mitigating evidence. The defendant also argues that his sentence was excessive as the State had proven no apparent motive for the murder and the other victim had suffered only superficial wounds. The State argues that the trial court rightly considered all mitigating evidence, and the sentence falls well within the statutory range.

¶ 71    The defendant, in his initial brief, acknowledged that he failed to make these arguments in the trial court, but he did not argue plain error. In its appellee brief, the State contended that the defendant has forfeited these arguments because he failed to make the necessary objections at the sentencing hearing and failed to file a motion to reconsider sentence. However, in response, the defendant raises plain error for the first time in his reply brief, which is sufficient to allow us to review his claims for plain error. See *People v. Williams*, 193 Ill. 2d 306, 348 (2000). The defendant then argues that we may review the claimed sentencing errors under the first prong of the plain-error doctrine.

¶ 72    "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Thus, when a defendant fails to preserve a claim of sentencing error, we may review the claim only if the defendant establishes plain error. *Id.* at 545. The plain-error doctrine is a narrow and limited exception to the general rule of forfeiture applicable to unpreserved claims. *Id.* Under the plain-error rule, a reviewing court will review an unpreserved sentencing error when a clear or obvious error occurs, and: (1) the evidence at the sentencing hearing was closely balanced; or (2) the alleged error was so serious as to deny the defendant a

fair sentencing hearing. *Id.* The first step in plain-error review is to determine whether there was clear or obvious error. *People v. Moon*, 2022 IL 125959, ¶ 22.

¶ 73 In general, where, as here, a sentence imposed by the trial court is within the statutory limits for the offense, we will not disturb the sentence absent an abuse of discretion by the trial court. *People v. McGee*, 2020 IL App (2d) 180998, ¶ 8. The reviewing court gives the trial court great deference when reviewing a sentence because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). The trial court is given this level of deference because it is in a better position to weigh such factors as defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). A sentence will be deemed excessive and the result of an abuse of discretion where it is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). Although a reviewing court has the power to reduce or alter a sentence, this power should be exercised cautiously and sparingly. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 74 The proportionate penalties clause of the Illinois Constitution requires that penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if the punishment is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. *People v. Miller*, 202 Ill. 2d 328, 338 (2002).

¶ 75 The Unified Code of Corrections sets out certain statutory factors in aggravation and mitigation that a trial court must consider when imposing a sentence of imprisonment. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020). In fashioning the appropriate sentence, the court must carefully

consider all of the factors in aggravation and mitigation, and other factors, such as defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime. *Calhoun*, 404 Ill. App. 3d at 385. However, of the factors in sentencing, "[t]he seriousness of the crime is the most important factor in determining an appropriate sentence." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Unless the sentence is grossly disproportionate to the nature of the offense committed, it should be affirmed. *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 50. While a trial judge at sentencing must balance the "retributive and rehabilitative purposes of punishment" (*People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990)), the judge is not required to articulate their process or consideration of mitigating factors regarding its sentencing decision. *Quintana*, 332 Ill. App. 3d at 109.

¶ 76    Having reviewed the evidence and transcript of the sentencing hearing, we are not persuaded that the evidence was closely balanced. While the defendant claims that the mitigating factors are "particularly strong," he offers only the following: at the time of sentencing, he had only one prior felony conviction for selling marijuana in 2011; he had a high school degree and had attended college; he had no mental illness and was in good physical health; he had no issues with drugs or alcohol; he took care of his mother until she moved out of state and his grandmother until she passed; he had a part-time job since 2015; he was raised by his father, a former military man; his father was murdered only a few years prior; and he was a compliant inmate while awaiting trial. In contrast, the seriousness of the crime should not be understated. See *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009) (a trial court may consider the manner in which the victim's death was brought about, along with the nature and extent of each element of the offense committed by the defendant). The murder occurred in broad daylight, at a place of business during business

28

hours, and without regard to the life and wellbeing of bystanders. In addition, the shooter fired multiple shots at the victim, left, then returned to stand over the victim and fired several more rounds into his upper body and chest. In considering, and balancing, the statutory factors, we do not find an abuse of discretion by the trial court in the sentence imposed.

¶ 77     As to the "unsurvivable life sentence" argument, we find this to be unpersuasive as well. As noted by appellate counsel, under the minimum requirements, the defendant would still serve 46 years and be 77 years old when released. While we cannot speculate as to future events, it could be argued that even the minimum sentence could be considered an "unsurvivable life sentence." A 40-year term for first degree murder is the exact middle of the sentencing range of 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2022). The required enhancement for personally discharging a firearm is 25 years to life (*id.* § 5-8-1(a)(1)(d)(iii)), and 35 years is at the low end of that range. We find that the trial court did not abuse its discretion given that the trial court was well within its authority to impose the 78-year sentence.

¶ 78                                   III. CONCLUSION

¶ 79     For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.


¶ 80     Affirmed.